## No. 23-10579-GG

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————

UNITED STATES OF AMERICA,
*Plaintiff/appellee,*

**v.**

JOHN R. MOORE, JR. &
TANNER J. MANSELL
*Defendants/appellants.*

———————

On Appeal from the United States District Court
for the Southern District of Florida

———————

JOINT INITIAL BRIEF BY APPELLANTS MOORE & MANSELL

———————

**ASHLEY M. LITWIN**
SEITLES & LITWIN, P.A.
**Counsel for Moore**
**40 N.W. 3RD ST. PH 1**
**Miami, FL 33128**
**(305) 403-8070**

**MICHAEL CARUSO**
 FEDERAL PUBLIC DEFENDER
**ANDREW L. ADLER**
 ASS'T FEDERAL PUBLIC DEFENDER
**Counsel for Mansell**
 1 E. Broward Blvd., Suite 1100
 Ft. Lauderdale, FL 33301
 (954) 356-7436

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL CASE)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

### United States v. Moore & Mansell
### Case No. 23-10579-GG

Appellant files this Certificate of Interested Persons and Corporate

Disclosure Statement, as required by 11th Cir. R. 26.1.

Adler, Andrew L.

Altonaga, Alyssa Maria

Caruso, Michael

Goldstein, Jeremy

Gonzalez, Juan Antonio,

Kirkpatrick, Lynn

Lapointe, Markenzy

Litwin, Ashley M.

Mansell, Tanner

Matthewman, Hon. William

McCabe, Hon. Ryon M.

McMillan, John

Moore, Jr., John R.

Otazo-Reyes, Hon. Alicia M.

Reinhart, Hon. Bruce E.

Rubio, Lisa Tobin

Seitles, Marc David

Watts-Fitzgerald, Thomas A.

United States of America

## STATEMENT REGARDING ORAL ARGUMENT

This is a direct criminal appeal of a five-day trial resulting in the conviction of two defendants for theft of property in the special maritime jurisdiction of the United States, in violation of 18 U.S.C. § 661.

Oral argument is necessary primarily because this appeal presents a question of law that is one of first impression not just in this Circuit but anywhere. To convict under § 661, the government must prove that the defendant had an "intent to steal or purloin" property. The question here is whether that element requires the defendant to take property for the use/benefit of himself or others, or if that element is satisfied merely where the defendant intends to deprive an owner of property on a temporary basis. Although § 661 was codified in 1948 and traces back to a 1790 statute, no federal court has ever addressed that legal question.

In addition to that novel question of law, this prosecution involved a novel set of facts. The defendants were convicted of "stealing" a fishing line in federal waters. But they took the line because they believed it was illegally killing sharks and other marine life. As it turns out, the line had received a rare NOAA research permit. Although the defendants never took any property for themselves or others, they are now convicted felons.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

DISCLOSURE STATEMENT ...................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS ............................................................. ii

TABLE OF CITATIONS ............................................................. iii

STATEMENT OF JURISDICTION .................................................. 1

STATEMENT OF THE ISSUE ....................................................... 2

INTRODUCTION ....................................................................... 3

STATEMENT OF THE CASE ........................................................ 5

    I.    Course of Proceedings & Disposition Below ......................... 5

    II.   Facts ................................................................................. 5

    III.  Standards of Review ........................................................ 18

SUMMARY OF THE ARGUMENT ................................................ 19

ARGUMENT AND CITATIONS TO AUTHORITY ............................ 21

    A.   Procedural Background .................................................... 21

    B.   Legal Background ............................................................ 27

    C.   Section 661 Requires a "Felonious" Intent, and Here That

          Required the Taking to be *Lucri Causa* ......................... 31

CONCLUSION ......................................................................... 39

CERTIFICATE OF COMPLIANCE ................................................ 40

CERTIFICATE OF SERVICE ...................................................... 41

# TABLE OF CITATIONS

<u>**CASES**</u>

*Allen v. United States*,
    164 U.S. 492 (1896)............................................................ 5, 16, 17, 26

*Bell v. United States*,
    462 U.S. 356 (1983)........................................................................ 29, 30

*Carter v. United States*,
    530 U.S. 255 (2000)........................................................................ 28, 30

*Dubin v. United States*,
    143 S. Ct. 1557 (2023)................................................................ 4, 35, 36

*Elonis v. United States*,
    575 U.S. 723 (2015).............................................................................. 35

*England v. United States*,
    174 F.2d 466 (5th Cir. 1949)............................................................... 33

*In re Quality Botanical Ingredients, Inc.*,
    249 B.R. 619 (Bankr. D. N.J. 2000)................................................... 36

*Jarecki v. BD Searle & Co.*,
    367 U.S. 303 (1961)............................................................................. 36

*Jolly v. United States*,
    170 U.S. 402 (1898)............................................................................. 27

*Morissette v. United States*,
    342 U.S. 246 (1952)................................................................... *passim*

*Ruan v. United States*,
    142 S. Ct. 2370 (2022)........................................................................ 35

*United States v. Armata*,
   193 F. Supp. 624 (D. Mass. 1961) ........................................................ 31

*United States v. Beard*,
   436 F.2d 1084 (5th Cir. 1971) .................................................... 27, 33

*United States v. Davis*,
   25 F. Cas. 781 (C.C. D. Mass. 1829) ................................................ 27

*United States v. Eckhardt*,
   466 F.3d 938 (11th Cir. 2006) ........................................................ 24

*United States v. Gristeau*,
   611 F.2d 181 (7th Cir. 1979) ........................................................ 31

*United States v. Hayden*,
   260 F.3d 1062 (9th Cir. 2001) ........................................................ 31

*United States v. Henry*,
   447 F.2d 283 (3d Cir. 1971) .................................................... 27, 31

*United States v. Maloney*,
   607 F.2d 222 (9th Cir. 1979) .................................................... 31, 33

*United States v. Moulton*,
   27 F. Cas. 11 (C.C. D. Mass. 1830) ............................................ 27, 28

*United States v. Schiradelly*,
   2009 WL 1010049 (D. S.D. Mar. 17, 2009) ........................................ 31

*United States v. Schneider*,
   14 F.3d 876 (3d Cir. 1994) ........................................................ 31

*United States v. Sharpnack*,
   355 U.S. 286 (1958) ................................................................ 33

*United States v. Takhalov*,

827 F.3d 1307 (11th Cir. 2016) ........................................................ 18

*United States v. Turley*,
  352 U.S. 407 (1952) ................................................................ *passim*

*United States v. Wiltberger*,
  18 U.S. 76 (1820) ............................................................................ 35

## STATUTES

18 U.S.C.
  § 641 ............................................................................................ 31
  § 659 ............................................................................................ 37
  § 661 ................................................................................ *passim*
  § 1708 .......................................................................................... 37
  § 2113(b) .............................................................................. 29, 30
  § 3231 ............................................................................................ 1
  28 U.S.C. § 1291 ............................................................................ 1
  Section 16 of the Crimes Act of 1790 ................................ 27, 28

## OTHER AUTHORITIES

2 Bishop on Criminal Law (9th ed. 1923) .............................. 35

4 W. Blackstone,
  Commentaries on the Laws of England (1769) .............. 28, 29, 34

11th Cir. Pattern (Crim.) Instr.
  O23.1 .......................................................................................... 37
  O66.1 .......................................................................................... 37

52B Corpus Juris Secundum (2023) .................................... 33

Black's Law Dictionary (8th ed. 2004) .................................. 36

Webster's Third New Int'l Dictionary (1986) ........................ 36

v

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 because the defendants were charged with an offense against the laws of the United States. This Court has jurisdiction under 28 U.S.C. § 1291, which confers jurisdiction on the courts of appeals from final decisions of the district courts. Mr. Mansell timely noticed an appeal on February 23, 2023 (DE 119), and Mr. Moore did so on February 24, 2023 (DE 121), both from the district court's final judgment of February 13, 2023 (DE 118).

## STATEMENT OF THE ISSUE

In this case, the defendants repeatedly requested the court to instruct the jury that, to satisfy the "intent to steal or purloin" element of 18 U.S.C. § 661, the government had to prove that they took property for the use or benefit of themselves or others. The issue here is whether the district court erred by failing to give that instruction in this case.

## INTRODUCTION

This federal criminal prosecution never should have been brought.

There can be no dispute that Mr. Moore and Mr. Mansell had good intentions. They interfered with a fishing line in open waters because they reasonably believed it was unlawfully killing sharks and marine line. They involved their passengers in this noble rescue effort. And they repeatedly advised law enforcement about what they were doing. Yet the defendants now find themselves convicted of a felony larceny offense.

As this brief explains, their convictions should be vacated because the district court failed to properly instruct the jury on the "felonious intent" required to elevate their conduct from a civil tort to a federal crime. Specifically, the court informed the jury that it had to convict Mr. Moore and Mr. Mansell if they merely intended to temporarily deprive someone of their property. Critically, that was true even if they had no intent to take the property for the use or benefit of themselves or others.

In a recent unanimous decision, the Supreme Court reaffirmed that it "has traditionally exercised restraint in assessing the reach of a federal criminal statute"—"both out of deference to the prerogatives of Congress and out of concern that a fair warning should be given to the world in

language that the common world will understand of what the law intends to do if a certain line is passed." *Dubin v. United States*, 143 S. Ct. 1557, 1572 (2023) (quotations and brackets omitted). "After all, crimes are supposed to be defined by the legislature, not by clever prosecutors riffing on equivocal language." *Id*. (quotation and brackets omitted).

This case cries out for such restraint. The federal larceny statute at issue here, 18 U.S.C. § 661, speaks in equivocal language: it criminalizes taking and carrying away property with the "intent to steal or purloin" it. But there is nothing to suggest that Congress wanted to make felons out of people like Mr. Moore and Mr. Mansell, who interfere with property not to "steal or purloin" it, but rather to rescue marine life that they reasonably thought was being illegally slaughtered. Nor would there otherwise have been any basis for Mr. Moore and Mr. Mansell to know that what they were doing was a crime, let alone a federal felony offense.

Although § 661 traces all the way back to 1790, counsel is unaware of any previous case presenting the legal issue here. Nor is counsel aware of any previous case involving analogous facts. That novelty serves as powerful evidence that the defendants are felons not because that is what Congress wanted but rather because of "clever prosecutor[ial] riffing."

4

## STATEMENT OF THE CASE

### I.    COURSE OF PROCEEDINGS & DISPOSITION BELOW

Mr. Moore and Mr. Mansell were charged with one count of theft in the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 661. (DE 3). They went to trial. After deliberations lasting longer than the trial itself—the jury transmitted seven notes, twice reported being deadlocked, and received an *Allen* charge—the jury returned a guilty verdict. (DE 59–67, 69). The district court denied the defendants' post-trial motion for a judgment of acquittal or a new trial. (DE 93, 95, 96, 100). The court sentenced them each to one year of probation and $3,343.72 in restitution. (DE 117, 118; DE 149:23–24).

### II.    FACTS

The facts of this case are highly unusual but also largely undisputed. The main dispute at trial was whether the defendants had the requisite "intent to steal" necessary for criminal liability under § 661.

### The Evidence & Arguments

**1.**    First: the basic facts. Mr. Moore and Mr. Mansell worked for a shark diving company in Jupiter, Florida. On August 10, 2020—with Mr. Moore as the captain and Mr. Mansell as the first mate—they took a

group of passengers on a charter to snorkel with sharks. The passengers included the Kuehl family from Kansas City. After a successful dive, and while still in federal waters, Mr. Moore and Mr. Mansell noticed a fishing line attached to a poly ball buoy. They told the passengers that this was an illegal fishing line that was killing sharks. For the next few hours, the defendants and the passengers collectively hauled the line into their boat. As they did so, the defendants cut the line to free sharks and other marine life caught on it. Some of this was captured by video taken by two of the Kuehls, who were all very excited to be saving dying sharks.

While that effort was underway, both defendants, along with their colleague who was back on land (Janelle), alerted and then repeatedly corresponded with law enforcement. They informed NOAA and Florida Fish and Wildlife that there was an illegal, abandoned fishing line killing sharks, and that they were cutting the line. They were not told to stop.

A few hours into the process, Mr. Mansell transferred to a second vessel for another charter. He took the fishing line with him, presumably so he could continue cutting it. Meanwhile, Mr. Moore and the passengers headed back to shore, with the line they had already cut on board. As they headed back, they met an officer from Florida Fish and Wildlife who

6

was responding to their earlier reports. The officer did not suggest that Mr. Moore had done anything wrong at that time. The officer instructed Mr. Moore to leave the line they had taken back on the dock. Mr. Moore did so. But after the line just sat on the dock for a few hours, the dock master instructed his employees to throw it in a dumpster. Mr. Moore later told the authorities that the line was in the dumpster. They recovered it, but much of the fishing gear attached to the line was gone.

As it turned out, the fishing line was legal. The line was set by the *Day Boat III*, a fishing vessel whose owner had obtained a rare permit from NOAA to help the federal government research sandbar sharks. Although no sandbar sharks were caught on the line, the defendants and their passengers freed 19 other types of sharks. As a result, the owner of the vessel lost fishing gear (hooks, weights, etc...) valued at $1,300.

Notably, there was no allegation or evidence that the defendants cut the line in order to take any property for themselves or others. Indeed, one of the Kuehls specifically testified at trial that the defendants were singularly concerned with saving sharks, not with taking the line. (DE 145:198–99). And even the prosecution agreed in closing that they cut the line in order to free and protect the sharks. (DE 146:170, 206).

7

**2.**    As for whether the defendants possessed the requisite "intent to steal," the parties offered competing theories and emphasized different aspects of the evidence, as reflected by the parties' closing arguments.

**a.**    The prosecution argued that the defendants intended to steal because they knew that the fishing line belonged to someone else. According to the prosecution, all that mattered was that the defendants intended to deprive someone else of their property. It did not matter what the defendants planned to do with the property, that they were motivated to protect the sharks, or that they mistakenly thought the fishing line was illegal. (*See, e.g.*, DE 146:147, 149, 159, 161, 170–71, 206).

To show that the defendants knew that the line belonged to someone else, the prosecution primarily emphasized that the buoy was marked (*id*. at 139, 141, 148–49, 162, 203)—albeit in faded letters bearing the name of the wrong vessel that neither of the two Kuehl witnesses recalled seeing. (DE 144:217; DE 145:68–71; DE 146:38). That fact, the prosecution argued, proved that the defendants knew that the line belonged to someone. Relatedly, the prosecution emphasized that, while the buoy had at one point been brought on board the defendants' vessel, it was not seen when Mr. Moore met with the Fish and Wildlife officer,

and it was never recovered, suggesting that the defendants had concealed this key piece of evidence. (DE 145:30, 238; DE 146:113–15, 163, 165–68).

The prosecution further observed that, when meeting with the Fish and Wildlife officer, Mr. Moore indicated that a green boat at sea had set the line. (DE 145:216, 236–37; DE 146:152, 165). And when Mr. Mansell called Fish and Wildlife a few hours after transferring to the second boat, he reported observing a fishing vessel and expressed concern about a potential confrontation over the line. (DE 145:243; DE 146:155–56).

Finally, to counter any suggestion that the defendants believed that the line was abandoned, the prosecution emphasized that the fishing gear was in new condition (not corroded) and the hooks were freshly baited. (DE 144:173, 202–04; DE 145:23; DE 146:79, 157–58, 165, 204, 206–07).

**b.**   For their part, the defendants primarily argued that they believed the line was illegal. While they made a good-faith mistake, they did not have a "bad purpose" to do something that the law forbids. (*E.g.*, DE 146:183, 187–89, 191). And that meant they did not intend to steal.

To support their argument, the defendants emphasized that they and Janelle alerted the authorities and were in constant communication about what they were doing. (*Id*. at 173–76, 179, 181, 184, 193, 195).

9

While the prosecution argued that they waited too long to call, the two Kuehl witnesses testified that they did so shortly after discovering the line. (DE 145:89, 186, 211). Moreover, cross examination of the case agent revealed exactly when Janelle and the defendants spoke to authorities, which they did several times over a four-hour period. And the evidence established that Janelle and the defendants candidly told NOAA and Fish and Wildlife—via email, radio/phone, and in person—that there was an illegal and abandoned line killing sharks, and that they were cutting the line. (*E.g.*, DE 145:89, 175, 205–06, 223–23, 225–27, 234, 255–56, 163–64; DE 146:63–56, 59, 60–61, 63–645, 67–68, 70–73, 103).

As to the in-person encounter—*i.e.*, when Mr. Moore met with the Fish and Wildlife officer—Mr. Moore told him everything that had happened, and he made no attempt to conceal the line that they had hauled on board. (DE 145:116–18, 143–44, 205–06, 259–64, 273–74; DE 146:185–86, 196). At that time, the officer did not seem upset or indicate that Mr. Moore had done anything wrong by removing and cutting the line. (DE 145:259–62; DE 146:175, 196). Mr. Moore then complied with the officer's direction to bring the line back to the dock. Contrary to the prosecution's suggestion that Mr. Moore threw the line

10

in the dumpster, the dock master specifically testified that he instructed his employees to get rid of the line after it sat on the dock for hours. (DE 144:237–38; DE 145:265–67, 273; DE 146:179–80, 196, 198–99).

The defendants further argued that their mistake was entirely reasonable. Because the buoy lacked any NOAA markings, flag, or GPS, and did not have a permit number on it, even the NOAA observer who was on board the *Day Boat III* testified that it would be reasonable for someone to think that the line was illegal. (DE 145:41–42, 44–45). In that regard, the NOAA shark-research permit was rare, with only 5–10 total permits issued per year. (DE 144:154, 206; DE 145:38, 146:172, 177–78).

Moreover, the Kuehl family—which included two police officers, one of whom was a police *chief*—believed that the line was illegal and did not belong to anyone. (DE 145:59, 81, 102, 130, 134–35, 208–10, 215; DE 146:181, 200). In that regard, the defendants directly involved the Kuehls in the effort (creating witnesses), allowed them to take video, and asked them to document the shark species being freed—actions all inconsistent with criminal intent. (DE 145:60, 71, 109–110, 118, 138, 142; DE 146:184, 194). The Kuehls themselves did not believe the defendants acted suspiciously or "duped" them. (DE 145:144–45, 151, 198, 204). In

11

fact, just before this trial, and despite knowing about the indictment, the Kuehl family (including law enforcement) reached out to Mr. Mansell and went on another diving excursion with him. (DE 145:61–62, 126–28, 150; DE 146:182–84, 200–01). Similarly, the dock master testified that Mr. Moore had a truthful and law-abiding character. (DE 144:239, 242).

### **The Jury Instructions**

The parties' competing arguments at closing were informed by the court's earlier rulings at the charge conference on the element of intent.

On that point, the court instructed the jury that the government had to prove that the defendants "acted with the intent to steal or purloin the property." (DE 57:8). The parties did not dispute that this was an element. But there was much dispute about what that element required.

Based on the parties' proposed instructions, the prosecution identified the crux of the issue now on appeal: "The defense has the idea that thievery, or theft, stealing only involves a crime if you intend to keep it for yourself, while the government's view is, the intent to knowingly take something that is not yours with the intent to deprive another of its use and enjoyment is, in fact, an offense." (DE 145:281). Ultimately, the court sided with the government, foreclosing that line of defense.

The court defined "steal" as "to wrongfully take property belonging to someone else with the intent to, either permanently or temporarily, deprive the owner of his right to the property or the use or benefit from it." (DE 57:9). The defendants, however, had requested that the court instruct the jury that "stealing" *also* required the defendants to take property with the intent "to convert it to one's use or the use of another." (DE 53:17). But the court sustained the government's objection to that requested instruction over the defendants' objection. (DE 146:4–9). And while the court defined "purloin" as to "appropriate wrongfully," which the defendants had requested, the court omitted the defendants' request to include additional language that purloining "stresses removing or carrying off for one's own use or purposes." (DE 53:17–18; DE 146:9–11).

The court also declined the defendants' request to include similar language in their theory-of-defense instruction. They asked the court to instruct the jury that, when a defendant does not take "items for his own use or benefit or the benefit or use of others, then he lacks the intent to steal or purloin and you must find him not guilty." (DE 53:24). However, the court had already rejected that argument in the context of the offense instructions. Instead, the court ultimately instructed the jury that the

13

sole defense "theory of the case [was] that the Defendants removed property without the bad purpose to disobey or disregard the law and therefore did not act with the intent to steal or purloin." (DE 57:12; *see* DE 146:17, 23–24, 128–135). That instruction essentially tracked the pattern instruction on "willfully" that the court gave. (DE 57:11).

The court also ruled against the defendants on other jury instructions as well. The court declined to give a good-faith instruction, which the defendants had requested. (DE 53:23; DE 146:14–19, 130–31). And the court overruled their objection to government's definition of a "taking" as something that "doesn't have to be any particular type of movement or carrying away. But any appreciable and intentional change in the property's location is a taking, even if the property isn't removed from the owner's premises." (DE 44-1:12; DE 57:9; DE 146:12–13).

Given the court's rulings, the defendants could not viably argue in closing that they lacked the intent to steal on the ground that they did not take property for the use or benefit of themselves of others. Instead, they were limited to arguing that they did not intend to steal because they did not have a bad purpose to disobey or disregard the law.

14

## **The Deliberations**

Although the defendants were limited in what they could argue in closing, the jury still deliberated extensively and carefully—as evidenced by the fact that it deliberated for longer than the actual trial itself, and by the seven notes it sent to the court before finally reaching a verdict.

*First*, the jury asked if it could have the call logs referenced by the case agent, who testified about exactly when the defendants and Janelle had corresponded with law enforcement. The court responded that the logs could not be provided because they were not in evidence, and the jury should rely on its own recollection of the evidence. (DE 59; DE 147:3–5).

*Second*, the jury asked if there was any further guidance on the definition of "mistake" or further clarity on "bad purpose." The former word was included in the pattern instruction on "knowingly." And the latter word was included in the pattern instruction on "willfully," as well as in the theory-of-defense instruction. The court responded that it could not provide additional guidance on those words, and that the jury should use its common sense about the ordinary meaning of those words together with all of the instructions as a whole. (DE 60; DE 147:5–10).

*Third*, the jury asked what license and training the defendants had at the time of the incident. The court responded that the jury could only consider the evidence that had been introduced. (DE 61; DE 147:10–12).

*Fourth*, the jury informed the court that it was "not unanimous. Cannot get there. How should we proceed?" At that point, the jury had been deliberating for about 5 hours and 45 minutes. The court responded by asking the jury to please continue with its deliberations in an effort to reach an agreement if it could do so. (DE 62; DE 147:12–15).

*Fifth*, the jury wrote that it was "still very divided. Some people have to leave at 5." The court responded by releasing the jury for the day and instructing the jury to return the next morning when the court would give the jury further instructions. The court was planning to give the jury an *Allen* charge first thing in the morning. (DE 63; DE 147:15–17).

*Sixth*, before leaving the day before, the jury had submitted another note asking the court to provide context for the "knowingly" and "willfully" instructions, observing that those words did not appear elsewhere. The court recognized that the jury made "a good point." It responded by modifying the offense instruction in two ways. First, it inserted the word "knowingly" before the element requiring proof that

the defendants "took and carried away" the property. There was no real dispute about that element. Second, it inserted the word "willfully" in the intent element, requiring proof that the defendants "acted willfully with the intent to steal or purloin the property." (DE 64; DE 148:3–8).

After the jury deliberated for another 90-plus minutes, the court gave the jury this Circuit's pattern *Allen* charge. (DE 65; DE 148:8–13).

<u>*Seventh*</u>, and over two hours after receiving the *Allen* charge, the jury asked its final and most telling question: "Page 12 of the instructions outlines the defense's theory of the case. This theory seems to speak to #3 on page 8"—*i.e.*, the "intent to steal or purloin" element. In other words, the jury wanted to know if there was "any other defense theories related to the 5 items [elements] on page 8." (DE 66:1).

The defendants expressed concern that the jury felt constrained by the court's theory-of-defense instruction, which was not the instruction that they had requested. They further asked the court to instruct the jury that it should consider all of the evidence at trial. (DE 148:15–20).

However, the court had already rejected the defendants' proposed instructions. So it merely directed the jury to consider all of the instructions, including the theory-of-defense instruction, and apply them

17

to the evidence. But the court told the jury that it could not amplify or add to those previously given instructions. (DE 66:2). Forty-four minutes later, the jury returned a guilty verdict. (DE 69; DE 148:20–21).

### III.  STANDARDS OF REVIEW

This Court "review[s] for abuse of discretion a district court's refusal to give a requested jury instruction." *United States v. Takhalov*, 827 F.3d 1307, 1311 (11th Cir. 2016). But, in doing so, this Court "review[s] the legal correctness of a requested jury instruction *de novo*." *Id.* at 1312 (quotation and brackets omitted).

## SUMMARY OF THE ARGUMENT

After leading a shark-diving excursion, the defendants enlisted their passengers in removing a fishing line that they came across at sea. They did so because they sincerely believed that this line was illegally killing sharks and other marine life. Indeed, they repeatedly alerted the authorities, explaining that they were cutting the line. Yet they now stand convicted of theft under 18 U.S.C. § 661, a federal felony offense.

Their convictions should be vacated because the district court erroneously instructed the jury on the "intent to steal or purloin" element of § 661. The court instructed the jury that the defendants possessed that intent if they intended to deprive someone of their property, even if on just a temporary basis. Thus, as long as they knew that the line belonged to someone else, the jury had to convict them for taking it, even though they believed that doing so was necessary to prevent illegal shark killing.

But the defendants instead requested the court to instruct the jury that, to satisfy § 661's *mens rea* element, the government had to prove that they took property for the use or benefit of themselves or others. There was no evidence they did so. To the contrary, the government's own eye-witness testified that they took the line only to protect marine life.

19

The district court erred by refusing to give the defendants' requested instructions. Under the common law, larceny required a "felonious intent" that was satisfied where a defendant took property *lucri causa*—for his own gain. While the defendants do not contend that § 661 is limited to common law larceny, they do contend that the jury instructions in this case should have included a *lucri causa* requirement.

That argument is supported by four points. <u>*First*</u>, the Supreme Court has already said that "stealing" means taking property with the intent to keep or convert it. <u>*Second*</u>, the Supreme Court has also held that, while "stealing" is not a common law term, it requires a "felonious" intent. Otherwise, criminal larceny offenses like § 661 would encompass civil trespass violations. At minimum, a "felonious" taking requires more than minimally and temporarily taking someone's property, as the jury was instructed here. <u>*Third*</u>, the canon of strictly construing penal laws and their *mens rea* elements supports a *lucri causa* requirement here. So too does the canon of noscitur a sociis: "steal" is accompanied by "purloin" in § 661, and the latter requires misappropriating property for one's own use. <u>*Finally*</u>, that very requirement is already contained in pattern jury instructions that this Court has adopted for analogous theft offenses.

20

## ARGUMENT AND CITATIONS TO AUTHORITY

The defendants requested the district court to instruct the jury that, in order to convict them under 18 U.S.C. § 661, the government was required to prove that they took the property for the use or benefit of themselves or others. The court reversibly erred by refusing to do so.

### A.    Procedural Background

**1.**    Section 661 provides, in relevant part: "Whoever, within the special maritime and territorial jurisdiction of the United States, takes and carries away, with intent to steal or purloin, any personal property of another" is guilty of a felony offense. At trial, the only real dispute was whether the defendants had the requisite "intent to steal or purloin."

In their proposed jury instructions, the defendants repeatedly requested the district court to instruct the jury that, to satisfy that element, the government had to prove that they intended to take property for the use/benefit of themselves or others. *First*, their proposed offense instruction defined "steal" to "mean[ ] to wrongfully take good[s] or property belonging to someone else with the intent to deprive the owner of the use or benefit permanently or temporarily *and to convert it to one's own use or the use of another*." (DE 53:17) (emphasis added). *Second*, the

21

defendants' proposed definition of "purloin" included: "removing or carrying off [property] for one's own use or purposes." (*Id*. at 17–18). And, *third*, in the defendants' proposed theory-of-defense instruction, they asserted that one of their "theor[ies] of the case [is] that when a defendant removes items from open water, *and does not take those items for his own use or benefit or the benefit or use of others*, he lacks the intent to steal or purloin and you must find him not guilty." (*Id*. at 24) (emphasis added).

The district court declined to give those proposed instructions. At the charge conference, the government objected to the language in the defendants' proposed offense instruction, arguing that § 661 "does not charge conversion." (DE 146:5, 8–9). The defendants responded that they "definitely want[ed] [that language] in," relying on the pattern instruction for 18 U.S.C. § 659 (theft of an interstate shipment), which contained the requested language. (*Id*. at 5–7). The court sustained the government's objection, reasoning that "[c]onversion differs from theft," and "I don't think conversion is an issue." (*Id*. at 7). And the court removed similar language from the definition of "purloin" that the defendants had requested. (*Id*. at 9–11). So that language was omitted entirely from the offense instruction the court gave to the jury. (DE 57:9).

22

As for the defendants' proposed theory-of-defense instruction, the district court *sua sponte* "cut it way, way down." (DE 146:17). The court believed that the proposed theory was "incorrect as a matter of law." (*Id.* at 22). As to the relevant aspect here, the court had already determined that § 661 did not cover conversion. Ultimately, the court instructed the jury that the sole theory of defense was "that the Defendants removed the property without the bad purpose to disobey or disregard the law and therefore did not act with the intent to steal or purloin." (DE 57:12).

In their post-trial motion, the defendants reiterated their objections to the district court's offense instruction omitting the requested "convert" language. (DE 93:20–22). And they reiterated their objection to the omission of similar language from the requested theory-of-defense instruction. (*Id.* at 17–18). The court denied their motion. (DE 100).

**2.**    "The failure of a district court to give an instruction is reversible error where the requested instruction (1) was correct, (2) was not substantially covered by the charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his

23

defense." *United States v. Eckhardt*, 466 F.3d 938, 947–48 (11th Cir. 2006). Here, the second and third prongs of that test are easily satisfied.

a.    As to the second prong, no other instruction addressed, much less covered, the defendants' proposed argument—namely, that they did not act with the "intent to steal or purloin" because they did not take the property for the use or benefit of themselves or someone else. The court instructed the jury that this element was met merely if the defendants intended, "either permanently or temporarily," to deprive the owner of his property. (DE 57:9). But the jury was not instructed that it also had to find that the defendants took the property for their own benefit or use.

Likewise, the court's theory-of-defense instruction merely reiterated that they needed to act "willfully"—*i.e.*, with a "bad purpose" to disobey or disregard the law. (DE 57:11–12; DE 64). But at no time did the court tell the jury that the defendants did not act with a bad purpose if they did not take the property for their own or others' benefits or use. To the contrary, the court's definition of "stealing" required only that the defendants intend to (temporarily) deprive the owner of property. If they did so, then they acted willfully by doing something that the law forbids.

In short, nowhere was this point covered in the court's instructions.

24

**b.**     As to the third prong, that omission was critical. There was no allegation, much less any evidence, that the defendants took the property for the use or benefit of themselves or others. They argued that they interfered with it because they thought it was an illegal, abandoned fishing line indiscriminately killing marine life. While the government argued that they knew the line belonged to someone, it never once argued that the defendants took any property for their own use or benefit.

To the contrary, one of the government's own eye-witnesses testified that the defendants were singularly concerned with saving sharks, not taking the line. (DE 145:198–99). The prosecution conceded during the charge conference that it was not "riding on conversion here, obviously." (DE 146:5). And the prosecution acknowledged in closing that the defendants took the line to protect sharks. (*Id*. at 170, 206). Thus, had the court instructed the jury that the government was required to prove the defendants took the property for their own use/benefit, the jury would have acquitted them. Indeed, it would have had no choice.

Confirming that outcome is this: by the end of deliberations, the jury was practically *begging* for a way to acquit the defendants. As the prosecution acknowledged well before the jury concluded, it "deliberated

longer than the time it took to present the evidence." (DE 147:16). Before finally reaching a verdict, the jury sent back seven notes, twice reported being deadlocked, and received an *Allen* charge. (*See* DE 59–67). Most tellingly, the jury's final note asked if there were "any other defense theories related" to the offense elements other than the sole theory-of-defense instruction it had received. (DE 66:1). Had the court instructed the jury that the government *also* had to prove that the defendants took the property for their own use/benefit, the jury would have had an alternative and—in light of the evidence—a *mandatory* basis to acquit.

**c.**    Thus, the issue on appeal here ultimately boils down to whether the defendants' proposed instructions were a correct statement of the law. In other words: to establish that the defendant had the requisite "intent to steal or purloin" under § 661, was the government required to prove beyond a reasonable doubt that the defendants took the property for the use or benefit of themselves or others? As explained below, the answer is yes. That is true for all § 661 cases. But it is especially true in this one given the other jury instructions. However, that question of statutory interpretation is a difficult one. And it appears to be one of first impression—not only in this Circuit but anywhere.

26

### B.    Legal Background

**1.**    Section 661 was originally codified in 1948, but the offense goes back to the Founding. Indeed, the "taking and carrying away of another's goods with intent to steal or purloin has been a Federal crime since 1790." *United States v. Henry*, 447 F.2d 283, 284–85 (3d Cir. 1971) (tracing statutory codification from 1790 through 1948). And, notably, § 661 carries forward the same key language of Section 16 of the Crimes Act of 1790, which made it a crime for any person within the exclusive jurisdiction of the United States to "take and carry away, with an intent to steal or purloin the personal goods of another." *United States v. Beard*, 436 F.2d 1084, 1089 n.7 (5th Cir. 1971) (quoting the 1790 statute).

In early cases, Justice Story looked to the common law of larceny to interpret Section 16's reference to "personal goods of another." *Jolly v. United States*, 170 U.S. 402, 406–07 (1898) (discussing *United States v. Davis*, 25 F. Cas. 781, 783 (C.C. D. Mass. 1829) (Story, J.)). He thought the common law "furnish[ed] the proper rule of interpretation," *Davis*, 25 F. Cas. at 783, because the language of the statute "approach[es] very near to the definition of larceny at the common law," *United States v. Moulton*, 27 F. Cas. 11, 14 (C.C. D. Mass. 1830) (Story, J.). And, he said,

common law larceny was "the *felonious* taking of the property of another, without his consent and against his will, with the *intent to convert it to the use of the taker*." *Moulton*, 27 F. Cas. at 14 (emphasis added).

Justice Story's understanding of common law larceny tracked Blackstone's. In his famous *Commentaries*, Blackstone explained that the "taking, and carrying away, must also be felonious; that is done by *animo furandi*: or, as the civil law expresses it, *lucri causa* [for gain's sake]." 4 W. Blackstone, Commentaries on the Laws of England 232 (1769); *see Carter v. United States*, 530 U.S. 255, 278–79 (2000) (Ginsburg, J., dissenting) (quoting this passage and explaining that the taking "had to be 'felonious,' a common-law term of art signifying an intent to steal"). Blackstone explained that the *lucri causa* requirement excluded "mere trespassers, and other petty offenders" who intentionally interfere with another's property but lack "felonious intent." Blackstone, *supra*, at 232.

**2.** Given Justice Story's reliance on the common law to interpret Section 16 of the 1790 Act, one might think that courts today should likewise look to the common law to interpret § 661. After all, the former is the progenitor of the latter. They contain the same operative statutory language (*i.e.*, "take and carry away, with intent to steal or purloin"). And

28

"where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached" to those terms "unless otherwise indicated." *Morissette v. United States*, 342 U.S. 246, 263 (1952). If § 661 was limited to common law larceny, then the defendants would simply rest on the *lucri causa* requirement from Blackstone.

But they acknowledge it is not that simple in light of *United States v. Turley*, 352 U.S. 407 (1952). In that case, the Supreme Court held that the word "'stolen' (or 'stealing') has no accepted common-law meaning." *Id*. at 411. There, the Court instead gave the word "stolen," as used in the National Motor Vehicle Theft Act, a "meaning consistent with the context in which it appears." *Id*. at 412–13. And, in that particular context, the Court held that "stolen" went beyond common-law larceny to capture "all felonious takings" of motor vehicles, including embezzlement and taking by false pretenses. *See id*. at 413–17.

The Supreme Court reaffirmed *Turley* in *Bell v. United States*, 462 U.S. 356 (1983). There, the Court interpreted 18 U.S.C. § 2113(b), which made it a crime to "take[ ] and carr[y] away, with intent to steal or purloin," certain property or money from a bank. (That language, of

course, mirrors the language in § 661). In *Bell*, the Court held that § 2113(b) was not limited to common law larceny (and thus included false pretenses) in part because Congress did not "adopt[ ] the elements of larceny in common-law terms." *Bell*, 462 U.S. at 360. While "take and carry away" *did* represent one element of common law larceny, § 2113(b)'s *scienter* language—"with intent to steal or purloin"—had "no established meaning at common law." *Id*. (citing *Turley*, 352 U.S. at 411).

In *Carter*, the Supreme Court reaffirmed *Bell*'s rationale and *Turley*'s holding. It emphasized that the *Morissette* "canon on imputing common-law meaning" applies "only when Congress employs a common-law *term*, and not when, as here, Congress simply describes an offense analogous to a commonlaw crime without using common-law terms." *Carter*, 530 U.S. at 264–65. The Court again cited *Turley*, which "declined to look to the analogous common-law crime because the statutory term at issue—'stolen'—had no meaning at common law." *Id*. at 266.

In light of the Supreme Court precedent above, the defendants here do not contend that § 661 is limited to common law larceny. Following *Turley* (and even before *Bell* and *Carter*), the few lower courts to address that issue had "uniformly held that" § 661 "is not limited to [larceny's

30

common law definition." *United States v. Schiradelly*, 2009 WL 1010049, at *3 (D. S.D. Mar. 17, 2009) (citing cases). As a result, some courts held that the government did not have to prove that a defendant intended to *permanently* deprive the owner of property, as the common law required. *See, e.g.*, *United States v. Gristeau*, 611 F.2d 181, 183–84 (7th Cir. 1979); *United States v. Maloney*, 607 F.2d 222, 229–31 (9th Cir. 1979); *Henry*, 447 F.2d at 432–35. And some held that § 661 reached embezzlement. *See, e.g.*, *United States v. Hayden*, 260 F.3d 1062, 1064–66 (9th Cir. 2001); *United States v. Schneider*, 14 F.3d 876, 880–81 (3d Cir. 1994); *United States v. Armata*, 193 F. Supp. 624, 625–66 (D. Mass. 1961). But no court has addressed whether § 661 contains a *lucri causa* requirement. It does. Or, at minimum, it should have been included in the instructions *here*.

## C. Section 661 Requires a "Felonious" Intent, and Here That Required the Taking to be *Lucri Causa*

**1.**    That conclusion is supported by Supreme Court precedent.

Four short years after the enactment of § 661 in 1948, the Supreme Court in *Morissette* interpreted the *mens rea* requirements of 18 U.S.C. § 641, a neighboring statute prohibiting theft of government property. During the Court's discussion, it said this: "Probably every stealing is a

31

conversion, but certainly not every knowing conversion is a stealing. To steal means to take away from one in lawful possession without right *with the intention to keep wrongfully*. Conversion, however, may be consummated without any intent to keep." *Morissette*, 342 U.S. at 271–72 (quotation omitted; emphasis in original; another emphasis omitted).

That passage, written shortly after § 661's enactment, supports the defendants' argument here. If "every stealing is a conversion," then every stealing requires the defendant to convert the property to their own use. And if "stealing" requires taking property "with the intention to keep [it] wrongfully," as the Court in *Morissette* said, then that would exclude mere trespassers who do not intend to take property for their own use or benefit. That contemporaneous understanding of "stealing" aligns with the instructions that the defendants requested and the court rejected.

**2.** *Turley* further supports that understanding. The Supreme Court held that, even though the theft statute there was not limited to common law larceny, it was still limited to "all *felonious* takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership." *Turley*, 352 U.S. at 417 (emphasis added). The Court clarified that it used the word "felonious" "in the sense of having criminal

32

intent rather than with reference to any distinction between felonies and misdemeanors." *Id.* at 411 n.4. Indeed, that intent is what "distinguishes larceny from a mere civil trespass, so while every taking of another's property without legal justification is a trespass on the owner's right to its continued possession, it does not constitute a crime unless the act is perpetrated feloniously." 52B Corpus Juris Secundum § 7 (2023).

In that regard, while § 661 may not be limited to common law larceny, all courts agree that it *does* define a "larceny" offense. Both the Supreme Court and this Court's predecessor have referred to it that way. *See United States v. Sharpnack*, 355 U.S. 286, 289 n.5 (1958) ("the following offenses committed within federal enclaves are now made criminal by such enactments of Congress: . . . larceny, 18 U.S.C. § 661"); *England v. United States*, 174 F.2d 466, 468 (5th Cir. 1949) ("Larceny within Section 661 may be of 'any personal property of another,' whether of the United States or anyone else"). Even lower courts that have held that § 661 includes embezzlement have still said that it is a "larceny" offense. *See Maloney*, 607 F.2d at 225–26 (citing cases). And this Court has taken a narrower view—holding that, based on the statutory history

33

and structure, § 661 does *not* cover embezzlement in addition to larceny. *See United States v. Beard*, 436 F.2d 1084, 1088–90 (5th Cir. 1971).

The question here, then, is whether the "felonious intent" required to distinguish "larceny" from trespass requires the *lucri causa* that it did under the common law that Blackstone described. While that question might be a difficult one to answer in the abstract, the Court need not resolve it here. That is so because, in this particular case, the jury instructions did not otherwise require the government to prove the defendants had the "felonious intent" necessary for a "larceny" offense.

The jury was required to convict if the defendants willfully took property with intent to "either permanently or temporarily" deprive the owner of his property. (DE 57:9). In other words, even if they intended to only temporarily (not permanently) take the property, that would have been sufficient to convict them. But that intent alone is not sufficiently "felonious." And, on top of that, the court also instructed the jury (over the defendant's objection) that a "taking" meant "*any* appreciable and intentional change in the property's location." (*Id*.) (emphasis added).

Given the court's offense instruction, and to ensure the defendants acted with felonious intent necessary for a criminal "larceny" offense (not

34

just a civil trespass violation), the government should have been required to prove that they took the property *lucri causa*—for their own gain. *See, e.g.*, 2 Bishop on Criminal Law 639 (9th ed. 1923) ("That the defendant took a pistol from a policeman merely to prevent him from using it against him will not be sufficient to make our larceny. The same is true where the defendant took a hog merely to protect his crop from injury, or took a dollar from his roommate to pay their common hotel bill.").

**3.**    Two related canons of construction support that argument.

**a.**    "The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself." *United States v. Wiltberger*, 18 U.S. 76, 95 (1820) (Marshall, C.J.). And, as mentioned at the outset, that rule continues to this day. *See Dubin*, 143 S. Ct. at 1572.

Moreover, strictly construing federal criminal statutes is most needed when it comes to *mens rea*, for "wrongdoing must be conscious to be criminal." *Ruan v. United States*, 142 S. Ct. 2370, 2376 (2022) (quoting *Elonis v. United States*, 575 U.S. 723, 734 (2015) (quoting *Morisette*, 342 U.S. at 252)). That construction underlies "the presumption of scienter": where a criminal statute is silent as to *mens rea*, courts will read one into the statute to "separate wrongful conduct from otherwise innocent

conduct." *Id.* at 2377 (quotation omitted). A similar approach should apply here, where strictly construing § 661's *mens rea* element will ensure that taking property is truly larceny (a federal crime subjecting one to prison) rather than mere trespass (a tort subjecting one to civil liability). Otherwise, civil torts will be transformed into federal crimes.

    **b.**    In addition to strictly construing the *mens rea* of penal laws to avoid criminalizing torts, there is the canon of noscitur a sociis: "a word is known by the company it keeps." That canon "is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. BD Searle & Co.*, 367 U.S. 303, 307 (1961); *see Dubin*, 143 S. Ct. at 1659 (reaffirming and applying this canon). Here, even assuming that "steal" may be capable of multiple meanings, one meaning—if not the primary meaning—is "[t]o take (personal property) illegally with *the intent to keep it* unlawfully." Black's Law Dictionary 1453 (8th ed. 2004) (emphasis added).

    In § 661, "steal" does not appear by itself; it is joined with the word "purloin." And, as the district court's jury instructions reflect (DE 57:9), "purloin" means to "appropriate wrongfully" or "to take away for oneself." *In re Quality Botanical Ingredients, Inc.*, 249 B.R. 619, 628 n.2 (Bankr.

D. N.J. 2000) (quoting Webster's Third New Int'l Dictionary (1986)). That meaning of "purloin" further supports requiring *lucri causa* before subjecting someone to criminal liability under § 661. Because "purloin" requires one to "appropriate" property for his own use or benefit, so should the accompanying word "steal." That harmonious reading would avoid giving "steal" an overbroad meaning ensnaring civil trespassers.

4.    Finally, that narrow construction would comport with pattern instructions that this Court has approved for analogous theft offenses.

The defendants took their definition of "steal" directly from this Court's pattern instruction for § 659, theft from an interstate shipment. They argued § 659 was analogous to § 661, in that the location of the theft is what supported federal jurisdiction. Under that pattern instruction, "steal" "means to wrongfully take goods or property belonging to someone else with the intent to deprive the owner of the use or benefit permanently or temporarily *and to convert it one's own use or the use of another*." 11th Cir. Pattern (Crim.) Instr. O23.1 (2023) (emphasis added).

A similar definition is also contained in this Court's pattern instruction for mail theft under 18 U.S.C. § 1708. 11th Cir. Pattern (Crim.) Instr. O66.1 ("The word 'steal' includes any act by which a person

37

purposely takes property belonging to someone else without the owner's permission *and with the intent to keep the property for that person's own use or for any person other than the true owner*.") (emphasis added).

To be sure, these pattern instructions are not dispositive. But they do lend further support to the defendants' argument here. And they illustrate that a *lucri causa* requirement for federal theft is hardly novel.

\* \* \*

The facts of this case vividly illustrate why federal criminal statutes and their *mens rea* elements should be strictly construed. There is no question that the defendants believed that the fishing line was illegal. After all, they advised the authorities what they were doing. Nor is there any question that they interfered with the line *not* to appropriate any property for themselves or others, but rather to save marine life they believed was being unlawfully slaughtered. Yet, under the court's instructions, the jury was required to convict them of larceny as long as they intended to deprive someone else of property—even if just temporarily, and even if there was no more than "any appreciable" change in the property's location. That intent is not sufficiently "felonious" to support federal criminal liability under § 661. While the

38

defendants' conduct may have constituted a trespass to chattel, there is a remedy for such a tort: a civil suit for money damages. But absent an instruction requiring the jury to find that Mr. Moore and Mr. Mansell took the property *lucri* causa—or with some other "felonious" intent that was absent here—these otherwise law-abiding defendants should not be branded federally convicted felons for the rest of their lives.

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that the Court vacate their § 661 convictions and remand for a new trial.

Respectfully submitted,

ASHLEY M. LITWIN                MICHAEL CARUSO
SEITLES & LITWIN, P.A.           FEDERAL PUBLIC DEFENDER
Counsel for Moore
40 N.W. 3 rd St. PH              */s/ Andrew L. Adler*
Miami, FL 33128                 ANDREW L. ADLER
(305)403-8070                     ASS'T FEDERAL PUBLIC DEFENDER
                                 Counsel for Mansell
                                 1 E. Broward Blvd., Suite 1100
                                 Ft. Lauderdale, FL 33301
                                 (954) 356-7436

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 8,053 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in New Century Schoolbook 14-point font.

*/s/ Andrew L. Adler*

**CERTIFICATE OF SERVICE**

I certify that on this 18th day of July 2023, I electronically filed the

foregoing document with the Clerk of the Court using CM/ECF, and it is

being served this day via CM/ECF on Laura Thomas Rivero, Assistant

U.S. Attorney, 99 N.E. 4th Street, Suite 523, Miami, FL 33132.

*/s/ Andrew L. Adler*