IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. **23-10579-GG**

United States of America,

Appellee,

- versus -

John R. Moore, Jr.,
and Tanner J. Mansell,

Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

BRIEF FOR THE UNITED STATES

Markenzy Lapointe
United States Attorney
Attorney for Appellee
99 N.E. 4th Street
Miami, Florida 33132-2111
(305) 961-9383

Daniel Matzkin
Chief, Appellate Division

Jonathan D. Colan
Senior Appellate Attorney
Of Counsel

**United States v. Moore & Mansell, Case No. 23-10579-GG**

**Certificate of Interested Persons**

In compliance with Fed. R. App. P. 26.1 and 11th Circuit Rules 26.1 and 28-1, the undersigned certifies that the list below is a complete list of the persons and entities previously included in the government's CIP, as well as additional persons and entities (designated in bold face) who have an interest in the outcome of this case.

**Adler, Andrew L.**

Altonaga, Alyssa Maria

Caruso, Michael

**Colan, Jonathan D.**

***Dayboat III***

Goldstein, Jeremy

Gonzalez, Juan Antonio

Kirkpatrick, Lynn

Lapointe, Markenzy

Litwin, Ashley M.

Mansell, Tanner J.

**United States v. Moore & Mansell, Case No. 23-10579-GG**

**Certificate of Interested Persons (Continued)**

Matthewman, Hon. William

**Matzkin, Daniel**

McCabe, Hon. Ryon M.

McMillan, John

Middlebrooks, Hon. Donald M.

**Moore, Jr., John R.**

Otazo-Reyes, Hon. Alicia M.

Reinhart, Hon. Bruce E.

**Rivero, Laura Thomas**

Rubio, Lisa Tobin

Seitles, Marc David

Taylor, Scott

**United States of America**

Watts-Fitzgerald, Thomas A.

/s/ Jonathan D. Colan
Jonathan D. Colan
Senior Appellate Attorney Attorney

**Statement Regarding Oral Argument**

The United States of America respectfully suggests that the briefs and record before this Court adequately present the facts and legal arguments and that oral argument would not significantly aid the decisional process.

# Table of Contents

**Page**:

Certificate of Interested Persons ........................................................ c-1

Statement Regarding Oral Argument ................................................... i

Table of Contents ............................................................................... ii

Table of Citations .............................................................................. iv

Statement of Jurisdiction ................................................................... vii

Introduction ....................................................................................... 1

Statement of the Issue ........................................................................ 1

Statement of the Case:

     1.    Course of Proceedings and Disposition in the Court Below ............ 2

     2.    Statement of the Facts ................................................... 2

          a.    The trial evidence .................................................... 2

          b.    The jury instructions ............................................... 16

     3.    Standard of Review ...................................................... 20

Summary of the Argument ................................................................. 20

# Table of Contents

## (continued)

**Page:**

Argument

The District Court Acted Within Its Discretion By Rejecting the Defense-Proposed Instruction That Incorrectly Added an Element to the Charged Offense. ........................................................................................ 21

    A.    Unlike adjacent statutes, § 661's plain text omits any requirement that offenders convert the taken property to their own or another's use. ....................................................................... 22

    B.    The district court's instructions were consistent with this Court's pattern jury instructions defining stealing. ....................................... 23

    C.    Stealing, in § 661, is not defined by common law larceny. ............. 28

    D.    The district court's instructions covered Appellants' argument that the jury must find criminal intent. .............................................. 32

Conclusion ...................................................................................... 37

Certificate of Compliance ................................................................. 38

Certificate of Service ........................................................................ 39

## Table of Citations

**Cases:**                                                                                    **Page:**

*Bonner v. City of Prichard*,

   661 F.2d 1206 (11th Cir. 1981) ...............................................................30

*Carter v. United States*,

   530 U.S. 255 (2000) ..................................................................... 29, 30

*Corley v. United States*,

   556 U.S. 303 (2009) ...............................................................................23

*Dresdner Bank AG v. M/V Olympia Voyager*,

   446 F.3d 1377 (11th Cir. 2006)............................................................30

*Morissette v. United States*,

   342 U.S. 246 (1952) ..................................................................... 28, 29

*United States v. Bell*,

   678 F.2d 547 (5th Cir. Unit B 1982)...................................................30

*United States v. Elso*,

   422 F.3d 1305 (11th Cir. 2005)..................................................... 20, 21

*United States v. Gristeau*,

   611 F.2d 181 (7th Cir. 1979)................................................... 27, 30, 31

*United States v. Hayden*,

   260 F.3d 1062 (9th Cir. 2001)..............................................................31

**Table of Citations (Continued)**

<u>Cases</u>:                                                                                                                   <u>Page</u>:

*United States v. Henry*,

   447 F.2d 283 (3d Cir. 1971)..................................................................27

*United States v. Schneider*,

   14 F.3d 876 (3d Cir. 1994)....................................................................31

*United States v. Spencer*,

   905 F.2d 1260 (9th Cir. 1990)...............................................................22

*United States v. Turley*,

   352 U.S. 407 (1957)...............................................................................29

*\*United States v. Williams*,

   5 F.4th 1295 (11th Cir. 2021) ...................................................... 21, 33

<u>**Statutes & Other Authorities**</u>:                                                  <u>**Page**</u>:

7 U.S.C. § 13 .........................................................................................23

18 U.S.C. § 641 ............................................................................... 22, 28

18 U.S.C. § 659 ............................................................................... 25, 27

18 U.S.C. § 661 ...................................................................... 1, *passim*

18 U.S.C. § 666 .....................................................................................26

18 U.S.C. § 1153 ...................................................................................30

18 U.S.C. § 1167 ...................................................................................23

18 U.S.C. § 1168 ...................................................................................23

**Table of Citations (Continued)**

**Statutes & Other Authorities:**                                    **Page:**

18 U.S.C. § 1707 ................................................................................. 23

18 U.S.C. § 1708 ................................................................................. 27

18 U.S.C. § 2113 ................................................................................. 30

18 U.S.C. § 2312 ................................................................................. 29

18 U.S.C. § 2314 ................................................................................. 25

18 U.S.C. § 3231 ................................................................................. vii

28 U.S.C. § 1291 ................................................................................. vii

Fed. R. App. P.4 ................................................................................. vii

Fed. R. App. P. 26.1 ........................................................................... c-1

Fed. R. App. P. 32 .............................................................................. 38

**Statement of Jurisdiction**

These are appeals from final judgments of the United States District Court for the Southern District of Florida in a criminal case. The district court entered judgment against John R. Moore, Jr. and Tanner J. Mansell on February 13, 2023 (DE:117, 118). The district court had jurisdiction to enter the judgments pursuant to 18 U.S.C. § 3231. Moore and Mansell filed timely notices of appeal on and February 24 and 23, 2023, respectively (DE:121, 119); *see* Fed. R. App. P.4(b). This Court has jurisdiction over their appeals pursuant to 28 U.S.C. § 1291.

## Introduction

There is no dispute about what the Appellants did. They took thousands of dollars worth of specialized fishing equipment they knew did not belong to them. They knew it was not theirs, and they deprived its owners of its use. Their defense at trial was that they believed they had legitimate reasons for doing so, but they never disputed what they did. While the evidence refuted their professed innocent intentions—they did it to provide their paying customers with an exciting shark encounter—the only question in this case is whether the trial judge correctly refused to instruct the jury that their admitted taking and carrying away of another's property was not stealing if they did not intend to convert the taken fishing gear to their own use. The jury was still instructed it had to find the Appellants acted knowingly and willfully to do something the law forbids and rejected their arguments to the contrary.

## Statement of the Issue

Whether the district court abused its discretion in rejecting a defense-proposed jury instruction that "steal[ing] and purloin[ing]," in violation of 18 U.S.C. § 661, requires not only the intent to deprive the owner of his possession and use of it, but also requires the intent to convert it to one's own use or the use of another.

**Statement of the Case**

1. **Course of Proceedings and Disposition in the Court Below**

Appellants John R. Moore, Jr. and Tanner J. Mansell were indicted by a federal grand jury in the Southern District of Florida and charged with violating 18 U.S.C. § 661 by, within federal waters and with the intent to steal and purloin, taking and carrying away the personal property of another, with a value exceeding $1,000 (DE:3).

After a five-day jury trial, Moore and Mansell were convicted as charged in the indictment (DE:69).

The district court subsequently entered judgment against Moore and Mansell, sentencing them each to serve a one-year term of probation and to pay a $100.00 assessment (DE:117, 118).

They each filed timely notices of appeal (DE:119, 121), and neither is incarcerated.

2. **Statement of the Facts**

   a. **The trial evidence**

The *Day Boat III* is a vessel rigged to participate in a federal research program collecting data on shark populations (DE:144:149). Program data is compiled from sampling caught sharks, rather than tagging and releasing them (DE:144:185; DE:145:6, 11). An observer from the National Oceanic and Atmospheric

2

Administration (NOAA) on board the vessel is responsible for collecting the data (DE:144:185; DE:145:6, 11).

Scott Taylor and his partner, Howard Bubis, own the *Day Boat III* (DE:144:148-49, 156). The boat carries and deploys orange buoys ("floats"), which put out fishing gear for allowed periods of time ("sets") (DE:144:49-51). Participating in this research project and deploying the buoys requires a permit from NOAA's National Marine Fisheries Service (DE:144:151-52). All of the information obtained from the effort (e.g., "catch per unit of effort," amount of time the sets are deployed ("soak time")), is reported and then "retained and verified by the science program for National Marine Fisheries. That's really the purpose of the sampling that's going on" (DE:144:153). The buoys used are required to be marked with the name of the vessel deploying them (DE:144:50, 218; DE:145:28, 46; DE:146:37). Buoys are not required to be marked with any NOAA name or logo, to have any GPS markers, or to otherwise indicate that the owners had the required NOAA permits (DE:144:218; DE:145:28-29, 32-33, 41-42, 46).

The research permitting system and regulations regarding fishing in federally-regulated waters were put in place by the Magnuson-Stevens Act of 1973 and are well known and publicized in the commercial fishing and diving industries (DE:144:159-60). "This is all about stock assessment, the health of the stock, and determining whether or not that the stock is recovering in such a way that to allow,

under Magnuson-Stevens, for maximum utilization of any of the species that could be potentially commercially harvested in the United States" (DE:144:191-92). "[I]t's fairly common knowledge who has the sandbar research permits within the industry" (DE:144:187). The *Day Boat III* had the required shark research fisheries permit (DE:144:160; DE:146:31-33).

A fishing vessel's crew is paid based on their catch, but their permit limits what species they are permitted to catch (DE:144:152, 161-63). Endangered species must be released (DE:144:162-63; DE:145:18). Soak times are limited specifically so that endangered animals can be released while still alive (DE:144:163, 178). Even before the main gear is deployed, test sets are used to see if endangered sharks are in the area requiring the vessel to move locations (DE:145:16).

The fishing gear used in these endeavors is specialized for these purposes and not easily replaced (DE:144:176-77, 181-83). The gear includes a heavy main line, with smaller but still substantial lines coming off of it attached with a clip system (gangions), all of which is held down by weights (DE:144:178-81).

4



(GX9; DE:144:287) ("a diagram of a bottom longline").[1] Specialized circular hooks "hook in the corner of the mouth," thus not "allow[ing] the animals to be hooked deeply," and therefore making it "easier to remove the hook from the animal" if it needs to be released (DE:144:182-83).

On August 10, 2020, the *Day Boat III* was primarily seeking sandbar sharks (DE:144:189). Tevor Hope, a United States Fish & Wildlife Service biological science technician, who at the time of these events was a NOAA observer, saw the *Day Boat III* deploy its longline fishing gear (DE:145:5-6, 10). The gear was in

---

[1] The complete set of admitted government exhibits is entered into the record as Docket Entry 76 (DE:76).

"good condition," including new hooks and gangions (DE:145:23). At 1:04 p.m., the second set of the day deployed 150 hooks on about a mile of line and two marked buoys (DE:145:26-27).

When the *Day Boat III* hauled in that set at 8:13 p.m., only 25 hooks were recovered from the line that remained (DE:145:29). The rest of the line appeared to have been cut (DE:145:29). They had begun hauling the line back in at 7:43 p.m., so something had happened to the line during a period of about six hours (DE:145:50).

During that six hours, it had been encountered by John Moore and Tanner Mansell, on their dive boat with the Kuehl family on vacation from Missouri (DE:145:57-58, 160-61). The Kuehl family had booked their excursion with Moore's and Mansell's company, Florida Shark Diving, based on the company's social media site (DE:145:59, 162). Florida Shark Diving's Instagram page sold them on an excursion to see bull sharks (DE:145:164, 166). A Kuehl family member testified that "[i]t looked like they saw a lot of the sharks we wanted to see" (DE:145:59). "We wanted to go see the bull sharks in the particular water of Jupiter, Florida. So we knew it was most likely guaranteed to see those sharks there" (DE:145:164). The family paid about $200 per person for the excursion, with an additional $50-$100 more for a photo package and gratuities (DE:145:185-86). Moore and Mansell took the family to a location where, they said, a tiger shark was known to have made a home and could be seen (DE:145:64-65, 167).

But on the way to see the tiger shark, Moore and Mansell stopped the dive boat near a buoy and pointed out a long fishing line (DE:145:68, 169-70). They did not see any other boats on their way to that location (DE:145:192-93). Moore and Mansell told the Kuehl family that it was an illegal fishing line and there might be sharks caught on it (DE:145:70). They "said they were able to look at it and identify it as an illegal longline" (DE:145:71). Moore and Mansell also described it to the family as an "illegal abandoned longline" (DE:145:170) and told them they would report the "abandoned" line (DE:145:186).

Based on what Moore and Mansell told them, the family helped pull the line and buoy out of the water and into their boat (DE:145:72, 171, 174-75). Pulling out this kind of extensive and heavy fishing gear "required a huge amount of effort to pull by hand," something that took "hours" (DE:144:202, 221; DE:145:72, 175). It required a "team effort by everybody who was on the boat" (DE:145:69, 174).

Family members took photos and videos that day, which included the time and location metadata that is automatically encoded onto such files (DE:145:60-61, 178), and many of these photos and videos were admitted as evidence at trial. Government Exhibits 30 and 31 showed Mansell and Moore, respectively, pulling in the line (DE:145:84; GXS30-31). Other photo exhibits showed the line, gangions, weights, and buoy hauled into Moore's and Mansell's boat (DE144:184; DE:145:74-

77, 181; GX12; GX24A; GX40; GX41; GX42). The same could be seen in videos admitted during the trial (DE:145:103-115).

The Kuehl family helped Moore and Mansell cut the lines where animals were caught and hauled the rest of the gear into their boat (DE:145:78). Moore and Mansell cut the lines where sharks were caught, while the family cut other lines (DE:145:86, 104, 110, 180-82). The Kuehls relied on what Moore and Mansell told them about what was legal or illegal about the line and the species caught on it (DE:145:73, 88, 102). It is only because of what Moore and Mansell told them that the family helped haul in the line (DE:145:82, 175).

The markings on the buoy, pulled out of the water by Moore and Mansell and their passengers that day, were identified during trial from video taken at the time (DE:145:111, 160, 179, 192). Still photographs from that video showed the name of the *Day Boat III's* sister boat, *Albi* (DE:145:112-14; GX25; GX46).



(GX25).

The Kuehl family thought they were doing the right thing (DE:145:105, 182). They were excited about their opportunity to rescue sharks, even posting to social media with a tally of "sharks saved so far," and later adding the comment "Best. Day. Ever." (DE:145:98-100; GX43).

Moore and Mansell did not explain the markings on the buoy (DE:145:173, 192). The family did not know at the time that the line belonged to someone with a permit to use it or that none of the sharks on the line were endangered (DE:145:152-53, 182-84; DE:146:31-32). Moore and Mansell told them that the line was illegal and that the caught sharks were endangered (DE:145:154, 184-85). Moore told the

9

family he was calling the Florida Fish & Wildlife Commission to report what they had found and done (DE:145:116, 175-76, 186). In fact, all of the fishing line, hooks, and weights the *Day Boat III* had deployed were authorized (DE:146:33-35).

Moore first called to Fish & Wildlife at 4:34 p.m. (DE:146:59). Phone records showed that Mansell had earlier communicated with another Florida Shark Diving employee, Janelle Van Ruiten, at 2:26 p.m. (DE:146:63). The contents of that call were not known (DE:146:64). But records did show that Van Ruiten called NOAA to report the longline at 2:45 p.m. (DE:146:64, 116). Thus, while Moore's first report was several hours after he, Mansell, and the Kuehl family began taking the line and gear onto their boat, the first report by anyone associated with Florida Shark Diving was made "approximately an hour, hour and a half" after retrieval of the gear began (DE:146:117).

Florida Fish & Wildlife Officer Barry Partelow responded to the report of illegal fishing in federal waters (DE:145:221-23). Although a state employee, Florida Fish & Wildlife officers are authorized to enforce regulations in federal waters as well (DE:145:224). He spoke with Moore, who reported that he had come across sharks caught on a line and had cut them off the line and hooks (DE:145:227). He did not report that the line had been attached to a marked buoy (DE:145:227). Officer Partelow advised him not to cut anything off the line until it had been investigated (DE:145:227-28).

10

Although Moore made no plans to meet with Officer Partelow on his return, Officer Partelow happened to encounter Moore's vessel later (DE:145:229-30). Officer Partelow saw that Moore's boat "was just absolutely covered in line" (DE:145:231). When he saw "the amount of line that was … on the hull of that boat, it was surprising that it was that much, then with combo of hooks and what looked to be fresh bait attached to hooks on the boat as well." (DE:145:231-32). He could tell that the line was new because "that hook has not a speck of rust or wear or anything on it" (DE:145:240). He testified that "[t]hat bait looks like it was set pretty recently, because if it wasn't, it would be turning colors…. [Y]ou wouldn't even recognize it. But everything about that said it was recently put in the water within, you know, a very short amount of time of when it was removed from the water" (DE:145:240). Government Exhibits 40 and 41 are photos Officer Partelow took when he observed Moore's boat, and they depict the line and one of the baited hooks (DE:145:232; GX40, GX41). They do not show any marked buoy on Moore's boat.



(GX40) (showing line and one piece of hooked bait).

Moore told Officer Partelow "that they ran into this line with all these fish attached to them, hooked to them, and they decided to cut them all off and retrieve the line and bring it back into their boat" (DE:145:234). He claimed that a green fishing boat may have been responsible for deploying the line (DE:145:236).

Moore never mentioned the marked buoy, and Officer Partelow did not see the buoy on the boat (DE:145:233-35). Officer Partelow testified why a marked buoy would have been important: "There has to be some kind of markings on a commercial fisherman's gear. So if there was a marking on there, it would be very clear that, hey, this belongs to somebody" (DE:145:234). Government Exhibit 38, a video of Officer Partelow's encounter with Moore, shows the line in Moore's boat and Officer Partelow taking a picture of the line, but not the marked buoy (DE:145:237-38; GX38; GX41). If Officer Partelow had seen a buoy, he "100 percent" would have taken a picture of it (DE:145:238).

Officer Partelow wanted to talk to NOAA to find out more about shark fishing in federal waters (DE:145:239). He knew that Moore's and Mansell's shark diving activities, themselves, would have been illegal if their boat had been in state waters when they encountered the line (DE:145:239).[2] Officer Partelow told Moore to keep the line, because he was going to take pictures of it and contact NOAA (DE:145:240). At trial, Officer Partelow explained: "At this point, I am really investigating of how this stuff got into the water. So I want him to hold on to it. I need him to retain that gear" (DE:145:241). Moore said he had another charter, and

---

[2] Shark diving and chumming the water to attract sharks would both have been illegal within Florida's 3-mile state water limit (DE:145:239). Trial evidence showed Florida Shark Divers engaged in both of these activities (DE:145:63, 73-74 167).

Officer Partelow said that was okay, but added: "Just hold on to it, and then I am going to come back and see you later" (DE:145:241).

While Officer Partelow was conducting his further investigation, he got a call from someone from Florida Shark Diving, saying they were worried about a confrontation with the fishing boat that had returned to the area (DE:145:243). Officer Partelow instructed them "that they needed to stop, they had no authority to touch those lines, to remove anything from those lines, and that they cannot get in a confrontation with the commercial fisherman that they saw" (DE:145:243).

A still photo taken from video from the surveillance cameras later back at the dock showed John Moore holding a knife to piled up fishing line on the dock at 5:29 p.m. (DE:144:228).



(GX14). Moore is seen in another photo with the fishing line piled in a cart (DE:144:231-32; GX22). After the fishing gear was left sitting on the dock for several hours, Christopher Perez, the dock master, instructed that it be thrown away (DE:144:237-38).

Officer Partelow ultimately located the *Day Boat III* and confirmed that it had the proper licenses and equipment for its operations (DE:145:246). He then called Moore and asked about the fishing gear, but Moore said that it was in the dumpster at the dock (DE:145:246). Moore offered no explanation for why he did not retain

15

the gear as asked (DE:145:247-48). Officer Partelow was able to retrieve some of the line from the dumpster, but the clips, hooks, and weights were missing (DE:145:248). The clips and the hooks would have been reusable and are the more expensive items to replace (DE:145:274-75).

The marked buoy that had appeared in earlier pictures and video was never located (DE:146:113-14). It appears in none of the pictures or video of the gear on Moore's boat after Officer Partelow arrived or later when the gear was unloaded onto the dock (DE:146:115).

A NOAA law enforcement agent calculated that the value of the *Day Boat III's* gear taken by Moore and Mansell totaled "just over $1,300" (DE:146:42). The value lost from the sharks that Moore and Mansell released "was, basically, on the low end around $1,150, and the high end around $2,900" (DE:146:44). He was also able to determine that the set line was located in federal waters at the time Moore and Mansell encountered it (DE:146:57).

### b.    The jury instructions

The district court instructed the jurors that in order to convict each defendant, the government had to establish beyond a reasonable doubt:

(1) that the property described in the indictment belonged to someone other than the defendant;

(2) the defendant took and carried away such property;

(3) the defendant acted with the intent to steal or purloin the property;

16

(4) the property had a value greater than $1,000; [and]

(5) the offense was committed within the special maritime and territorial jurisdiction of the United States.

(DE:146:212). The district court further explained:

> To steal or lawfully [sic] take means to wrongfully take property belonging to someone else with the intent to either permanently or temporarily deprive the owner of his right to the property or the use of the benefit from it.

> A taking doesn't have to be any particular type of movement or carrying away, but any appreciable and intentional change in the property's location is a taking even if the property isn't removed from the owner's premises.

> To "purloin" means to appropriate wrongfully.

(DE:146:213). It also explained:

> The word knowingly means that an act was done voluntarily and intentionally and not because of a mistake or accident.

> The word willfully means that the act was committed voluntarily and purposefully with the intent to do something the law forbids. That is, with the bad purpose to disobey or disregard the law.

(DE:146:215).

Previously, at the charge conference, the defense had sought to insert a conversion requirement into the definition of stealing and purloining relying on pattern instructions for a different statute that, unlike § 661, includes conversion (DE:145:280-83).

The proposed defense instruction read:

17

> To "steal" or "unlawfully take" means to wrongfully take good or property belonging to someone else with intent to deprive the owner of the use or benefit permanently or temporarily *and to convert it to one's own use or the use of another*.
>
> [To "steal" means to take away from one in lawful possession without right, with the intention to keep wrongfully.]
>
> To "purloin" means to appropriate wrongfully and often by a breach of trust*, it stresses removing or carrying off for one's own use or purposes*.

(DE:53:17-18) (emphasis added). The government responded that "that is not the definition of steal or take away" (DE:146:5).

The district court rejected the defense-proposed definitions, ruling that the theft criminalized in § 661 was different from the broader thefts, including conversion, in the separate statute which the defense cited in support of its proposed instruction.

> I mean, conversion is when you get something lawfully and then you keep it, and in the interstate context, which you mentioned, this theft of interstate goods, often a shipper might be given the material and have an authorization to take possession in the first instance but then decides to keep it, and that's what conversion is.
>
> Conversion differs from theft in that regard…. I don't think conversion is an issue ….

(DE:146:7).

The district court did, however, inform the jury that "[i]t's the defense's theory of the case that the defendants removed property without the bad purpose to disobey

or disregard the law and therefore did not act with the intent to steal or purloin" (DE:146:215).

When the jury sent a note asking for "further guidance on the definition of a 'mistake'" and "further clarity on what constitutes 'bad purpose,'" the district court told the jurors to "apply your common sense to the ordinary meaning of those words together with all of the instructions as a whole" (DE:60).[3] The jury's last note pointed out the fact—not raised on appeal—that the district court had not included the words "knowingly" or "willfully" in any of its original elements instructions; it had just defined those terms. Indeed, all parties had omitted those words from their proposed elements instructions (DE44-1:11-12; DE:53:16-18). In response to their request for "context" for the definitions of those words, and without objection from the parties, the district court amended its original instructions adding that a guilty verdict required the jury to find that "the Defendant knowingly took and carried away" the property and that "the Defendant acted willfully with the intent to steal or purloin the property" (DE:64). The district court responded to a final jury note questioning "any other defense theories related" to the offense elements," instructing

---

[3] The defense had asked for a response pointing the jury to the specific instructions addressing those terms, but the district court did not "want to focus them on particularly one instruction. I think they need to look at all of the instructions and apply their common sense to the meaning of those two words" (DE:147:9).

the jury to "consider all of the instructions including the defense's theory of the case and apply them to the evidence and the facts as you find them" (DE:66).

**3.    <u>Standard of Review</u>**

This Court "review[s] a district court's refusal to give a requested jury instruction for abuse of discretion." *United States v. Elso*, 422 F.3d 1305, 1308 n.5 (11th Cir. 2005).

<b>Summary of the Argument</b>

The district court acted within its discretion to refuse a legally-incorrect defense-proposed instruction defining stealing in 18 U.S.C. § 661. Unlike adjacent statutes, § 661 contains no requirement that taken property be converted to the offender's use, as the defense instruction would have stated. Binding authority has rejected the argument that stealing, as used in federal statutes, is limited to the common law definition of larceny, on which Appellants rely for their conversion argument. No such association with larceny or conversion was necessary in order to ensure that the jury found that the defendants acted with the requisite criminal intent. The district court instructed the jury that they had to find that Moore and Mansell acted knowingly and willfully, that is, not by mistake, but with bad purpose to do something the law forbids. Because the defense-proposed instruction would have incorrectly added a conversion element to a statute lacking any such requirement

20

and because criminal intent was already substantially covered in other instructions, the district court did not abuse its discretion in rejecting the requested instruction.

## Argument

### The District Court Acted Within Its Discretion By Rejecting the Defense-Proposed Instruction That Incorrectly Added an Element to the Charged Offense.

There is no error in refusing to give a legally-incorrect jury instruction. "[A] defendant is entitled to a jury instruction that conveys his theory of defense," but only "as long as it has some basis in the evidence and has legal support." *United States v. Elso*, 422 F.3d 1305, 1308 (11th Cir. 2005) (quotation omitted). "Refusal to give a requested jury instruction is reversible error only if (1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself." *United States v. William*s, 5 F.4th 1295, 1304 (11th Cir. 2021) (internal quotation omitted). None of those conditions are present here.

The defense-proposed instruction was not correct. The district court's given instruction was consistent with binding precedent and other decisions defining the term stealing as used in 18 U.S.C. § 661 and similar statutes, as well as this Court's pattern instructions. The judge still required the jury to find criminal intent, and

defense counsel were thus able to argue that Moore and Mansell believed they were acting properly to stop a crime. The jury rejected that defense and found that they acted with criminal intent. Their convictions should be affirmed.

### A.    Unlike adjacent statutes, § 661's plain text omits any requirement that offenders convert the taken property to their own or another's use.

Appellants' proposed instruction incorrectly added the requirement that they intended to convert the taken fishing equipment to their own or others' use and did not merely intend to deprive the owner of its possession. But that is not what the statute provides. Title 18, Section 661 makes it a crime to "take[] and carr[y] away, with intent to steal or purloin, any personal property of another," within the special maritime and territorial jurisdiction of the United States. 18 U.S.C. § 661.

The elements of § 661 do not include conversion to one's own or another's use. "The elements of Section 661 are: (1) within the special maritime and territorial jurisdiction of the United States; (2) taking and carrying away; (3) with intent to steal or purloin; (4) the personal property of another." *United States v. Spencer*, 905 F.2d 1260, 1262 (9th Cir. 1990).

Contrast § 661 with 18 U.S.C. § 641, which uses additional language to add the concept of conversion to a list already containing stealing or purloining. That statute makes it a crime to "embezzle[], steal[], purloin[], *or* knowingly convert[] to his use or the use of another." 18 U.S.C. § 641 (emphasis added). If stealing or

purloining required conversion, that language would be superfluous. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (cleaned up).

Distinguishing stealing or purloining from conversion, as § 641 does, is consistent with other statutes that add conversion as an additional means of committing a crime along with stealing or purloining. *See* 7 U.S.C. § 13 (making it a crime "to embezzle, steal, purloin, or with criminal intent convert to such person's use or to the use of another" certain property); 18 U.S.C. § 1707 (addressing "[w]hoever steals, purloins, or embezzles any property used by the Postal Service, or appropriates any such property to his own or any other than its proper use").

But like § 661, not every federal theft statute includes conversion. *See* 18 U.S.C. § 1167 (addressing "[w]hoever abstracts, purloins, willfully misapplies, or takes and carries away with intent to steal," without including conversion); 18 U.S.C. § 1168 (addressing one who "embezzles, abstracts, purloins, willfully misapplies, or takes and carries away with intent to steal," without including conversion).

**B.    The district court's instructions were consistent with this Court's pattern jury instructions defining stealing.**

The district court properly instructed the jury that, for charges of violating § 661:

> To steal or lawfully [sic] take means to wrongfully take property belonging to someone else with the intent to either permanently or temporarily deprive the owner of his right to the property or the use of the benefit from it.
>
> A taking doesn't have to be any particular type of movement or carrying away, but any appreciable and intentional change in the property's location is a taking even if the property isn't removed from the owner's premises.
>
> To "purloin" means to appropriate wrongfully.

(DE:146:213). These definitions are consistent with those provided in pattern instructions for charges of violating similar statutes that do not include a conversion to one's own or another's use requirement.

The rejected defense-proposed definitions of stealing and purloining relied on pattern instructions for a different statute that, unlike § 661, includes conversion (DE:145:280-83).

> The proposed defense instruction read:
>
> To "steal" or "unlawfully take" means to wrongfully take good or property belonging to someone else with intent to deprive the owner of the use or benefit permanently or temporarily *and to convert it to one's own use or the use of another*.
>
> [To "steal" means to take away from one in lawful possession without right, with the intention to keep wrongfully.]
>
> To "purloin" means to appropriate wrongfully and often by a breach of trust*, it stresses removing or carrying off for one's own use or purposes*.

(DE:53:17-18) (emphasis added). The defense argued that such conversion was included in the definition of "steal" in pattern instruction 23.1, regarding theft of an

24

interstate shipment in violation of 18 U.S.C. § 659 (DE:146:6; *see* Eleventh Circuit Patter Jury Instructions, Criminal Cases (2022), O23.1).

But § 659 expressly contains a conversion to one's own use element not found in § 661, the statute the Appellants were charged with violating. A theft of an interstate or foreign shipment by carrier makes it a crime to, among other things, "embezzle[], steal[], or unlawfully take[], carr[y] away, or conceal[], or by fraud or deception obtain[] from" various named types of carriers, "*with intent to convert to his own use*" goods moving in interstate commerce 18 U.S.C. § 659 (emphasis added). Section 661 contains no such requirement.

The district court understood that including conversion is necessary in some circumstances, such in the case of common carriers who might steal property given into their possession by the owner by converting it to their own use (DE:146:7). But conversion is not necessary to make any kind of theft a crime.

The district court's definition of stealing was consistent with this Court's pattern instructions for those terms. For charged violations of 18 U.S.C. § 2314 by transporting certain stolen property, "to steal" property is defined as "to wrongfully or dishonestly take property with the intent to deprive someone of the rights and benefits of owning it." Eleventh Circuit Pattern Jury Instructions, Criminal Cases (2022), O88.1. There is no requirement that the person who stole the property did so for his own use or benefit.

25

For charged violations of 18 U.S.C. § 666(a)(1), the pattern instruction defines stealing as "wrongfully or intentionally tak[ing] the money or property belonging to someone else with the intent to deprive the owner of its use or benefit permanently or temporarily." Eleventh Circuit Pattern Jury Instructions, Criminal Cases (2022), O24.1. Like § 661, the text of § 666(a)(1) contains no requirement that an offender take the property for his own use. Section 666(a)(1) makes it a crime to "embezzle[], steal[], obtain[] by fraud, or otherwise without authority knowingly convert[] to the use of any person other than the rightful owner or intentionally misapplies, property" of federally supported programs. 18 U.S.C. § 666(a)(1). Thus, in addition to stealing, one can also violate this statute by converting property to the use of any person other than the rightful owner. But conversion to one's own or another's use is not necessary for the offender to violate the statute by stealing. Thus, that definition of stealing is relevant to its use in § 661.

The pattern instruction definition of stealing in § 641 is similar. *See* Eleventh Circuit Pattern Jury Instructions, Criminal Cases (2022), O21 ("[To 'steal' or 'convert means to wrongfully or intentionally take the money or property belonging to someone else with the intent to deprive the owner of its use or benefit permanently or temporarily."). That pattern instruction does not require a defendant to have taken the property for his own use in order to have stolen it, only to have deprived the owner of the property his use. In addition to defining what it means to "steal," that

26

instruction does require that "the Defendant [embezzled] [stole] [knowingly converted] the money or property to his own use or to someone else's use," but that is because § 641's plain text, like § 666(a)(1), includes additional "converts to his use or the use of another" language not found in § 661 at issue here.

As below (DE:146:6), Appellants point to the inclusion of a conversion to one's own use requirement in the pattern instruction for charged violations of 18 U.S.C. § 659 (Br. at 37). But that statute includes the requirement that an offender took the described property "with intent to convert [it] to his own use." 18 U.S.C. § 659. Section 661 contains no such requirement.

The pattern instruction for charged violations of 18 U.S.C. § 1708, cited by the Appellants (Br. at 37), defines stealing to "include[] any act by which a person purposely takes property belonging to someone else without the owner's permission and with the intent to keep the property for that person's own use or for any person other than the true owner." This instruction requires one to "keep" the property and thus permanently deprive the owner of its possession. That is not a requirement of § 661. *See United States v. Henry*, 447 F.2d 283, 284 (3d Cir. 1971) (rejecting the argument that "the intent to permanently deprive an owner of his property is an essential element of the offense described in 18 U.S.C. § 661"); *See also United States v. Gristeau*, 611 F.2d 181, 184 (7th Cir. 1979) (same).

27

**C.    Stealing, in § 661, is not defined by common law larceny.**

Controlling authority from the Supreme Court and the former Fifth Circuit, as well as persuasive decisions from other courts, reject the idea that stealing requires common law larceny's conversion element.

The district court correctly recognized that conversion is not relevant to this case. "[I]n the interstate context, … this theft of interstate goods, often a shipper might be given the material and have an authorization to take possession in the first instance but then decides to keep it, and that's what conversion is" (DE:146:7). But, the district court added, "[c]onversion differs from theft in that regard" (*id.*). The district court cited in support of its ruling *Morissette v. United States*, 342 U.S. 246 (1952), a case relied on by both the government and the defense (DE:146:7).

*Morissette* had noted that "there is considerable overlapping in the embezzlement, stealing, purloining and knowing conversion" terms used in § 641 (theft of public money, property, or records). *Morissette*, 342 U.S. at 271. That statute, as noted above, lists "conver[sion] to his use or the use of another" along with stealing, purloining, and embezzling. 18 U.S.C. § 641. The Supreme Court explained that "[w]hat has concerned codifiers of the larceny-type offense is that gaps or crevices have separated particular crimes of this general class" and "[t]he codifiers wanted to reach all such instances." *Morissette*, 342 U.S. at 271. The Court remarked that "[p]robably every stealing is a conversion, but certainly not every

28

knowing conversion is a stealing." *Id.* The district court, here, recognized that stealing and conversion are distinct concepts, treated differently by Congress in various statutes. In practice, they often overlap. All that *Morissette* reflects is the recognition that acts of stealing will often, even perhaps usually, also include conversion. But that does not mean that an act of stealing necessarily requires conversion to one's own or another's use.

The Supreme Court interpreted a similar statute that used the word "stolen" without any mention of conversion, in *United States v. Turley*, 352 U.S. 407 (1957). The statute there in question made it a crime to "transport[] in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen." 18 U.S.C. § 2312. The Supreme Court rejected the argument that "the meaning of the word 'stolen,' as used in this provision, is limited to a taking which amounts to common-law larceny." *Turley*, 352 U.S. at 408. This was so because the word "'stolen' (or 'stealing') has no accepted common-law meaning." *Id.* at 411. "Freed from a common-law meaning, we should give 'stolen' the meaning consistent with the context in which it appears." *Id.* at 412-13.

The Supreme Court reaffirmed its *Morissette* and *Turley* analyses in *Carter v. United States*, 530 U.S. 255 (2000), when it refused to look to common law larceny to interpret a statute making it a federal crime to "take[] and carr[y] away, with intent

29

to steal or purloin, any ... thing of value exceeding $1,000 belonging to, or in the possession of, any bank." *Id.* at 259, 264-67 (interpreting 18 U.S.C. § 2113(b)).

The former Fifth Circuit held similarly that "the term 'steal,' as used in [18 U.S.C. § 2113(b)], embraces 'all felonious takings ... with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny.'" *United States v. Bell*, 678 F.2d 547, 548 (5th Cir. Unit B 1982). All that was required was that the offender deprive the owner of the property's use and benefit—there was no requirement that he convert it to his own or another's use. That decision remains binding in this Circuit.[4]

Specifically addressing § 661—the statute at issue here—the Seventh Circuit joined the Eighth, Ninth, and Tenth Circuits in holding "that [§ 661] defines the federal crime of larceny contained in [18 U.S.C. § 1153[5]] and that the crime is not limited to its common law definition." *Gristeau*, 611 F.2d at 183. More recently, in

---

[4] While all decisions from the former Fifth Circuit before October 1, 1981, became binding within the new Eleventh Circuit, Unit B decisions issued after that date but decided by judges who joined this new circuit are also binding. *Dresdner Bank AG v. M/V Olympia Voyager*, 446 F.3d 1377, 1381 n.1 (11th Cir. 2006); *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[5] In relevant part, 18 U.S.C. § 1153 provided that:

> [a]ny Indian who commits against the person or property of another Indian or other person . . . larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States. . . .

*United States v. Hayden*, 260 F.3d 1062 (9th Cir. 2001), the Ninth Circuit reiterated "that the word 'steal' [in § 661] is of the broadest generic nature, and therefore covers all forms of wrongful handling of property." *Id.* at 1065-66.

Addressing § 661, the Seventh Circuit thus affirmed a district court's instruction that

> '(t)o steal' means to acquire or possess as a result of some wrongful act or dishonest act or taking, whereby a person willfully obtains or retains possession of property which belongs to another, without or beyond any permission given, and with the intent to deprive the owner of the benefit of ownership.

*Gristeau*, 611 F.2d at 183. In another § 661 case, the Third Circuit affirmed an instruction stating that

> the terms "steal or purloin" meant any taking where a person, without permission and "by some wrongful act, willfully obtains or retains possession of property belonging to another."

*United States v. Schneider*, 14 F.3d 876, 880 (3d Cir. 1994). These instruction are comparable to the one given in this case.

Appellants disclaim any reliance on the common law argument that the courts have squarely rejected (Br. at 29), but their "*lucri causa*" argument repeatedly cites the common law as its basis (Br. at 20, 28, 34). Appellants' argument comes down to their assertion that "[u]nder the common law, larceny required a 'felonious intent' that was satisfied where a defendant took property *lucri causa*—for his own gain" (Br. at 20). They argue that "the jury instructions did not otherwise require the

31

government to prove the defendants had the 'felonious intent' necessary for a 'larceny' offense" (Br. at 34). But stealing in violation of § 661 is not defined by common law larceny.

Common law larceny may not be at issue, but the jury here was instructed that they had to find Moore and Mansell acted willfully, thus satisfying any requirement of felonious intent.

### D.    The district court's instructions covered Appellants' argument that the jury must find criminal intent.

Contrary to Appellants' argument (Br. at 36), requiring the jury to find that they acted "purposefully with the intent to do something the law forbids," meaning "with the bad purpose to disobey or disregard the law" (DE:146:215), provided the *mens rea* requirement that separates their federal crime from a civil trespass. The jury heard their argument that they lacked criminal intent and rejected it.

At trial, Moore and Mansell argued that they reported the fishing line to authorities and therefore "didn't have bad intent" when they took it (DE:146:173). They framed the issue before the jury correctly, noting that "the facts of this case are largely not in dispute," only the defendants' "[s]tate of mind" (DE:146:193). "Did these gentlemen possess the conscious intent to steal fishing line and hooks? Is that what motivated them? Or was this an honest mistake?" (DE:146:193).

Defense counsel highlighted that Moore's and Mansell's actions were all done "in broad daylight," in front of both the Kuehl family and law enforcement officials

taking photos and video (DE:146:183-84). The defense argued that Moore and Mansell "believe[d] a crime has been committed," that someone was "indiscriminately killing sharks," because "[s]omebody left an abandoned line, an illegal line, whatever you want to call it" (DE:146:174). It just "turn[ed] out they were wrong," because "[s]omebody had a license for that line" (DE:146:174). But the defendants "had no intent to steal, … they thought they were doing the right thing" (DE:146:192).

Specifically, with regard to the disputed conversion instruction, the defense argued that this was "not some grand conspiracy to steal someone's line" (DE:146:178). They argued that Officer Partelow told Moore to "leave it on the dock, which he did. He left it on the dock. He left it on for hours until the dockmaster ordered other people to remove the line" (DE:146:196).

Ultimately, the defense was able to argue, citing the district court's willfulness instruction (DE:146:188-89), that if they found Moore's and Mansell's actions were not "done with bad purpose, you have to find a verdict of not guilty" (DE:146:183). The jury's guilty verdict thus implicitly and necessarily rejected the defense explanations and found that they did act with bad purpose.

The defense theory that they simply made a mistake and thought they were pulling up an illegal or abandoned fishing line was adequately covered by the district court's "knowingly" and "willfully" instructions. *See Williams*, 5 F.4th at 1304

(reversal is only necessary when a rejected instruction was not substantially covered by other instructions).

The district court first instructed that the defendants had to have "wrongfully take[n]" or "appropriate[d] wrongfully" the property (DE:146:213). It then explained that to have acted "knowingly" "means that an act was done voluntarily and intentionally and not because of a mistake or accident" (DE:146:215). In explaining what it meant that the defendants had to have acted willfully, the district court instructed the jury that "[t]he word willfully means that the act was committed voluntarily and purposefully with the intent to do something the law forbids. That is, with the bad purpose to disobey or disregard the law," regardless of whether the defendants were "aware of the specific law or rule that his conduct may be violating" (DE:146:215). The district court put it all in the context of explaining that "the defense's theory of the case that the defendants removed property without the bad purpose to disobey or disregard the law and therefore did not act with the intent to steal or purloin" (DE:146:215).

The weight of the trial evidence is not at issue in this appeal, but even so, the evidence supports the jury's finding of felonious intent and is not contradicted at all by the fact that Moore and Mansell told the Kuehl family that the line was illegal and called the authorities. Their motive was to provide a shark experience for their paying customers, as promised in their social media advertising (DE:145:59, 162,

164-67). Making up a false story about the line being illegal and saving sharks is exactly what people trying to please their customers would say while at the same time knowingly and willfully taking away another boat's fishing line and gear (DE:146:170). Not only did their actions release more sought-after sharks back into their diving grounds, but they provided their customers with what they understood to be a great altruistic adventure they could brag about on social media—the "Best. Day. Ever." (DE:145:98-100; GX43). As the government argued to the jury: "They duped the Kuehl family to help them in a criminal act" (DE:146:170).

That they told the Kuehl family and authorities that it was an illegal line says nothing about whether they themselves actually thought so. A key piece of evidence the government highlighted (DE:146:158, 166-69) was that the marked buoy deploying the line was missing, never to be seen again, after it was earlier seen in the pictures the Kuehl family took when they hauled the line in (DE:145:112-14; GX25; GX46), but not later when Officer Partelow arrived (DE:145:232; GX40, GX41). The Kuehl family admitted they knew nothing about shark fishing regulations (DE:145:66, 164, 215), and they would have had no idea about the significance of the marked buoy seen in their photos and video (DE:145:87). But regulatory officials would know the significance of a marked buoy attached to the line.[6] It would contradict Moore's and Mansell's story to the family that this was an

---

[6] Appellants note (Br. at 8) that the buoy was marked with the name of the *Day Boat*

illegal or abandoned line. No one would leave the name of their boat attached to such a line. But, conveniently, before Moore showed the gear to Officer Partelow, the buoy disappeared. The government argued this showed their criminal intent (DE:146:170).

Moore also misdirected the authorities when he said that the line may have come from a green boat (DE:145:236), despite the fact that they had seen no boats on their way to encountering the line (DE:145:192-93). In contrast to their description of the line to the Kuehl as "abandoned," "it was clearly fresh gear that was actively being fished because it had animals that was on it, and it was clear that it was commercial" (DE:144:202).

Ultimately, the evidence showed, and Moore and Mansell never disputed, that they took and carried away the marked property of someone else. And even after being told to preserve it, Moore is seen in photo evidence, continuing to cut up the line with his knife back at the dock (DE:144:228; GX14). The evidence supported the requirement that Moore and Mansell took and carried away property belonging to another with the intention of depriving the owner of its use.

---

*III's* sister ship, but testimony established that sometimes buoys are shared among a permit holder's boats, so one deployed buoy might bear the name of a sister vessel (DE:144:217-18). At trial, a NOAA law enforcement agent testified that using a buoy with a different boat's name could result in a "small civil fine," but it would not warrant any seizure of the property (DE:146:38-39).

The evidence showed and the properly instructed jury found that Moore and Mansell took that property without mistake, but with the bad purpose to do something the law forbids.

## Conclusion

The district court's refusal to add a conversion element to its jury instructions was within its discretion and not reversible error. For that reason, Appellants' convictions should be affirmed.

Respectfully submitted,

Markenzy Lapointe
United States Attorney

By:  /s/ Jonathan D. Colan
Jonathan D. Colan
Senior Appellate Attorney
99 N.E. 4th Street, #517
Miami, FL 33132
(305) 961-9383
Jonathan.Colan@usdoj.gov

Daniel Matzkin
Chief, Appellate Division

Of Counsel

37

**Certificate of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,976 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements for Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, 14-point Times New Roman font.

**Certificate of Service**

I hereby certify that four copies of the foregoing Brief for the United States were mailed to the Court of Appeals via Federal Express this 26th day of October 2023, and that, on the same day, the foregoing brief was filed using CM/ECF and served via CM/ECF on Andrew L. Adler, Assistant Federal Public Defender, counsel for Tanner J. Mansell and Ashley M. Litwin, Esq., counsel for John R. Moore, Jr.

/s/Jonathan D. Colan
Jonathan D. Colan
Senior Appellate Attorney

*ab*

39