No. 23-10579-GG

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff/appellee*,

v.

JOHN R. MOORE, JR. &
TANNER J. MANSELL
*Defendants/appellants.*

_____

On Appeal from the United States District Court
for the Southern District of Florida

_____

JOINT REPLY BRIEF BY APPELLANTS MOORE & MANSELL
_____

ASHLEY M. LITWIN            MICHAEL CARUSO
SEITLES & LITWIN, P.A.       FEDERAL PUBLIC DEFENDER
Counsel for Moore            ANDREW L. ADLER
40 N.W. 3RD ST. PH 1         ASS'T FEDERAL PUBLIC DEFENDER
Miami, FL 33128              Counsel for Mansell
(305) 403-8070                1 E. Broward Blvd., Suite 1100
                              Ft. Lauderdale, FL 33301
                              (954) 356-7436

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL CASE)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

### United States v. Moore & Mansell
### Case No. 23-10579-GG

The Appellants file this Certificate of Interested Persons and Corporate Disclosure Statement, as required by 11th Cir. R. 26.1.

Adler, Andrew L.

Altonaga, Alyssa Maria

Caruso, Michael

Colan, Jonathan D.

Goldstein, Jeremy

Gonzalez, Juan Antonio,

Kirkpatrick, Lynn

Lapointe, Markenzy

Litwin, Ashley M.

Mansell, Tanner

Matthewman, Hon. William

Matzkin, Daniel

McCabe, Hon. Ryon M.

McMillan, John

Moore, Jr., John R.

Otazo-Reyes, Hon. Alicia M.

Reinhart, Hon. Bruce E.

Rivero, Laura Thomas

Rubio, Lisa Tobin

Seitles, Marc David

Watts-Fitzgerald, Thomas A.

United States of America

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................... C-1

TABLE OF CITATIONS ............................................................. ii

ARGUMENT AND CITATIONS TO AUTHORITY ................................ 1

   I.    The Appellants' requested instructions were correct. ............... 3

       A.   The Government's interpretation of § 661 conflicts with the Supreme Court's larceny precedent. ................... 4

       B.   The Government's interpretation of § 661 conflicts with established rules of statutory construction. ............ 10

   II.   The Appellants' requested instructions were not adequately covered by the willfulness instruction. .................. 17

   III.   The Appellants' requested instructions would have required an acquittal had they been given. ............................. 19

   IV.   The Government's attempt to retry the case backfires…......... 22

CONCLUSION ......................................................................... 30

CERTIFICATE OF COMPLIANCE ........................................................ 31

CERTIFICATE OF SERVICE ............................................................. 32

i

# TABLE OF CITATIONS

<u>CASES</u>

*Cleveland v. United States*,
   531 U.S. 12 (2000) .................................................................................13

*Dubin v. United States*,
   599 U.S. 110 (2023) ..........................................................................2, 11

*Hawaiian Airlines, Inc. v. Norris*,
   512 U.S. 246 (1994) ..............................................................................13

*Johnson v. United States*,
   576 U.S. 591 (2015) ..............................................................................15

*Kelly v. United States*,
   140 S. Ct. 1565 (2020) ..........................................................................11

*Lamie v. U.S. Trustee*,
   540 U.S. 526 (2004) ..............................................................................17

*Loughrin v. United States*,
   573 U.S. 351 (2014) ..............................................................................17

*Marinello v. United States*,
   138 S. Ct. 1101 (2018) ..........................................................................10

*Marx v. Gen. Revenue Corp.*,
   568 U.S. 371 (2013) ..............................................................................16

*Morissette v. United States*,
   342 U.S. 246 (1952) ........................................................ 4–6, 13–15, 17

*Rimini St., Inc. v. Oracle USA, Inc.*,
   138 S. Ct. 873 (2019) ............................................................................17

*U.S. v. Atl. Research Corp.*,
   551 U.S. 128 (2007) ................................................................. 16

*United States v. Bell*,
   678 F.2d 547 (5th Cir. Unit B 1982) (en banc) ...................... 9

*United States v. Carter*,
   776 F.3d 1309 (11th Cir. 2015) ............................................ 15

*United States v. Gristeau*,
   611 F.2d 181 (7th Cir. 1979) ................................................. 9

*United States v. Maloney*,
   607 F.2d 222 (9th Cir. 1979) ................................................. 9

*United States v. Olano*,
   507 U.S. 725 (1993) .............................................................. 13

*United States v. Takhalov*,
   827 F.3d 1307 (11th Cir. 2016) ............................................ 22

*United States v. Turley*
   352 U.S. 407 (1957) ........................................................... 6–10

*Van Buren v. United States*,
   141 S. Ct. 1648 (2021) .......................................................... 11

*Yates v. United States*,
   574 U.S. 528 (2015) .............................................................. 12

## STATUTES

18 U.S.C.
   § 641 ................................................................... 4, 14, 17
   § 659 .................................................................... 15–16
   § 661 ................................................... 2–11, 13–17, 29–30
   § 666 ..................................................................... 15, 17
   § 1708 ......................................................................... 16

**O**THER **A**UTHORITIES

11th Cir. Pattern (Crim.) Instr. (2023)
   O23.1 ...................................................................................... 16
   O66.1 ...................................................................................... 16

Edgar Allan Poe,
   *The Purloined Letter* (1845).................................................... 13

## ARGUMENT AND CITATIONS TO AUTHORITY

At trial, the evidence was substantial—overwhelming really—that Mr. Moore and Mr. Mansell did not believe that they were breaking the law. In fact, they believed that they were *respecting* the law by removing an ostensibly illegal fishing line that was slaughtering protected marine life. After all, they were in constant communication with law enforcement about what they were doing. People do not usually call the cops on themselves while they are committing a crime. It is no wonder that the jury wanted to acquit them, as its two deadlocks and seven notes reflect.

Nonetheless, the district court's jury instructions prevented the jury from legally doing so. That is because, over the Appellants' repeated objections, the court instructed the jury that they possessed the requisite "intent to steal or purloin" as long as they intended to deprive an owner of property (even just temporarily). Thus, the jury was required to convict as long as it found that the Appellants knew that the property belonged to someone else. And, critically, that meant it had to convict even if—as was undisputed here—they had no intent to take that property for the use or benefit of themselves or others. Again, they cut the line only to stop what they reasonably thought was an illegal shark-killing operation.

1

The only real question here, then, is whether the district court's jury instructions were legally correct. The Government does not dispute the Appellants' initial observation (at i) that this presents a question of first impression—not just in this Circuit but anywhere. That fact is both revealing and troubling. Although 18 U.S.C. § 661 and its predecessors date back to the Founding, never before has the Government tried to stretch this federal larceny statute so far—prosecuting people who took property only to resolve an exigent situation, not to enjoy it themselves.

This is exactly the sort of case requiring the exercise of restraint in the interpretation of a federal criminal statute. Indeed, an unbroken line of Supreme Court decisions over the past decade have criticized federal over-criminalization and rejected expansive interpretations of federal criminal statutes that would sweep in conduct that ordinary people would not think is a crime. *See Dubin v. United States*, 599 U.S. 110, 129–31 (2023); *infra* Part I.B(1). The Government simply ignores these cases.

But ordinary people would not have thought that what the Appellants did here was a federal *crime*. And restraint is particularly appropriate because there was an adequate, alternative remedy short of a federal criminal prosecution: a civil tort action for trespass to chattel.

2

## I.    The Appellants' requested instructions were correct.

Section 661 prohibits taking, "with intent to steal or purloin," personal property in the maritime jurisdiction of the United States. In its instructions here, the district court defined "steal" as taking property "with the intent to, either permanently or temporarily, deprive the owner of his right to the property or the use or benefit from it." (DE 57:9).

The Appellants, however, had requested that the district court define "steal" to further require an intent to "convert [the property] to one's own use or the use of another." (DE 53:17). And the Appellants had requested a theory-of-defense instruction likewise providing that they "lack[ed] the intent to steal or purloin" if they did not take the property "for [their] own use or benefit or the benefit or use of others." (*Id*. at 24).

As the Appellants recounted in their initial brief (at 13–14, 21–23), the district court denied their requests. Thus, the jury was required to find that the Appellants acted with an "intent to steal or purloin" as long as it found that they took property with the intent to (temporarily) deprive someone of their property—even if they did not take the property with the intent to use or benefit from it themselves. The Appellants' requested instructions were legally correct; the district court's were not.

3

### A. The Government's interpretation of § 661 conflicts with the Supreme Court's larceny precedent.

**1.** Although the § 661 question presented here is one of first impression, the Supreme Court has already interpreted the word "steal."

In the seminal case of *Morissette v. United States*, 342 U.S. 246 (1952), the Supreme Court interpreted the federal larceny statute in 18 U.S.C. § 641. Then, as now, that statute made it a crime to "embezzle[ ], steal[ ], purloin[ ], or knowingly convert[ ]" government property. *Id.* at 248 & n.2. The Court held that the conversion element required a showing of intent, even though the statute did not so expressly provide.

In so holding, the Court rejected the argument "that, if we construe the statute to require a mental element as part of criminal conversion, it becomes a meaningless duplication of the offense of stealing, and that conversion can be given meaning only by interpreting it to disregard intention." *Id.* at 271. Finding no such surplusage, the Court explained that "every stealing is a conversion, but certainly not every knowing conversion is a stealing." *Id.* "To steal means to *take away from one* in lawful possession without right with the *intention to keep wrongfully*." *Id.* (emphasis in original; quotation omitted). In other words, it explained,

4

stealing necessarily encompassed conversion. "Conversion, however, may be consummated . . . without any wrongful taking." *Id*. at 271–72.

In their initial brief (at 20, 31–32), the Appellants relied on this passage in *Morissette* to argue that "steal" in § 661 requires not merely an intent to deprive an owner of property but also an intent to convert it (*i.e.*, to keep, use, or benefit from it). In response, the Government asserts (at 29) that "[a]ll *Morissette* reflects is the recognition that acts of stealing will often, even perhaps usually, also include conversion. But that does not mean that an act of stealing necessarily requires conversion to one's own or another's use." However, that is not what the Court said in *Morissette*. It said that "[p]robably *every* stealing is a conversion." *Id*. at 271 (emphasis added). And, critically, the Court then went on to define "stealing" as taking property "with the intention to keep wrongfully." *Id*.

In its brief, however, the Government wholly ignores the Supreme Court's express definition of "stealing," even though that is the central term at issue in this case. This Court, however, is not free to so ignore binding Supreme Court precedent. Indeed, *Morissette*'s definition of the term "stealing" should resolve this case. After all, the Supreme Court defined that term in a neighboring federal theft statute. And it did so just

5

four years after the enactment of § 661, reflecting the contemporaneous understanding of that term. Here, however, the district court defined "stealing" as the taking of another person's property with intent to deprive that person of it—without any intent to convert the property for one's own use/benefit. That instruction misstated the law.

**2.** Although *Morissette* alone requires vacatur here, that conclusion is further bolstered by *United States v. Turley*, 352 U.S. 407 (1957). The Appellants' additional argument based on *Turley* requires the Court to vacate the convictions based on the instructions given in this particular case—without the need to definitively interpret § 661.

**a.** In their initial brief (at 20, 32–33), the Appellants explained that *Turley* established that federal "larceny" statutes like § 661 require a "felonious taking" to distinguish those criminal offenses from civil torts. In *Turley*, the Supreme Court held that the word "stolen," as used in the National Stolen Property Act, was not limited to common-law larceny but nonetheless required a "*felonious taking* with intent to deprive the owner of the rights and benefits of ownership." *Id*. at 408 (emphasis added); *see id*. at 407. The Court explained that it was using the word "felonious" "in the sense of having criminal intent rather than with reference to any

6

distinction between felonies and misdemeanors." *Id.* at 411 n.4. Here, the Government (at 29) ignores this key aspect of *Turley*. But it ultimately does not dispute (at 32) that § 661 requires a "felonious taking."

The instructions in this particular case, however, did not require the jury to find a "felonious taking." As the Appellants explained in their initial brief (at 20, 34–35, 38), that is due to the omission of the conversion language that they requested—plus two additional features of the court's instructions. First, the court instructed the jury that the Appellants engaged in "stealing" if they intended to deprive the owner of his property rights "either permanently or temporarily." (DE 57:9). Second, the court instructed the jury that "stealing" included "any appreciable and intentional change in the property's location." (*Id.*). Thus, the jury in this case was required to convict the Appellants if it found that they effectuated *any* intentional change to the property's location that would even *temporarily* deprive the owner of his rights.

Given those aspects of the instructions, more was needed to ensure that the jury found the requisite "felonious taking" for a federal larceny offense. Indeed, the jury here was required to convict if it found that the Appellants intended to do no more than minimally and temporarily move

7

the fishing line to stop what they believed to be illegal shark killing. That is not a "felonious taking." The "felonious taking" requirement, however, would have been satisfied had the court instructed the jury that it *also* had to find that the Appellants intended to take the property for the benefit of themselves or others. As explained in their initial brief (at 27–28), that requirement was called *lucri causa* (*i.e.*, for gain's sake) at common law, differentiating criminal larceny from the tort of trespass.

**b.**    The Government's response attacks a straw man. It argues (at 30–32) that § 661 does not incorporate common-law larceny. But the Appellants expressly declined (at 28–31) to argue that it did. For that point does not refute their argument. Even though § 661 may not incorporate common-law larceny, *Turley* still means that § 661 must require a "felonious taking." And, in this case, the district court's "temporary deprivation" and "any appreciable change" instructions fell short of that requirement. As explained, that shortcoming would have been remedied by the *lucri causa* instruction the Appellants requested.

In that regard, common-law larceny "require[d] that the defendant have the intent to *permanently* deprive the victim of property." *United States v. Gristeau*, 611 F.2d 181, 183 (7th Cir. 1979) (emphasis added).

8

*see United States v. Maloney*, 607 F.2d 222, 227, 229 (9th Cir. 1979). Thus, by instructing the jury to convict if it found an intent to *temporarily* deprive the victim of property, the district court already broadened § 661 beyond common-law larceny. By omitting a *lucri causa* requirement as well, the court broadened § 661 even further beyond the common law. That critical omission—together with the court's "temporary deprivation" and "any appreciable change" instructions—allowed the jury to convict without finding a sufficiently "felonious taking," as required by *Turley*.

None of the cases cited by the Government addressed any argument like the one made here. For example, the Government cites *United States v. Bell*, 678 F.2d 547 (5th Cir. Unit B 1982) (en banc). But that case held only that the federal bank robbery statute was not limited to common-law larceny, and the statute therefore covered takings by means of deceit or false pretenses. *Id*. at 548–49. In so holding, the Court relied on *Turley* for the general proposition that the statute included "all felonious takings." *Id*. at 548 (quotation omitted). But the Court had no occasion to address whether jury instructions like the ones in this case satisfied the "felonious taking" standard that *Turley* required. The same is true of the out-of-circuit cases upon which the Government relies (at 30–31).

9

The Government's only other argument on this point (at 32) is that the court's willfulness instruction satisfied the "felonious taking" requirement. However, as explained in Part II below, this argument is entirely circular. The willfulness instruction merely incorporated the "stealing" instruction, as the "stealing" instruction told the jury what "the law" forbade for purposes of the willfulness instruction. And the "stealing" instruction did not require the jury to find a "felonious taking."

## B. The Government's interpretation of § 661 conflicts with established rules of statutory construction.

Two established rules of statutory construction further support the Appellants' argument in this case. The Government ignores them both.

**1.**    The Supreme Court has "traditionally exercised restraint in assessing the reach of a federal criminal statute," in part "out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (quotation omitted). Over the last decade, the Supreme Court has repeatedly reversed lower courts for adopting expansive interpretations

of federal criminal statutes where a narrower interpretation was available and would accord with the expectations of ordinary people.

In *Dubin*, for example, the Supreme Court most recently rejected the Government's broad interpretation of the federal aggravated-identity theft statute—which would have swept in *any* use of someone's identity to commit certain offenses—because that interpretation bore "little resemblance to any ordinary meaning of 'identity theft.'" 143 S. Ct. at 122; *see id.* at 115 (emphasizing that the Government's interpretation extended "well beyond the ordinary understandings of identity theft"); *id.* at 120 (same); *id.* at 124–26 (same). In *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021), the Court rejected the Government's broad interpretation of the Computer Fraud and Abuse Act because it "would attach criminal penalties to a breathtaking amount of commonplace computer activity," transforming "millions of otherwise law-abiding citizens [into] criminals." In *Kelly v. United States*, 140 S. Ct. 1565, 1568, 1574 (2020), the Court rejected the Government's broad interpretation of federal fraud statutes because, despite undisputed evidence of "wrongdoing," "corruption," and "abuse of power," "the result would be . . . a sweeping expansion of federal criminal jurisdiction." And, in *Yates v.*

11

*United States*, 574 U.S. 528 (2015), the Court rejected the Government's argument that the Sarbanes-Oxley Act's criminal prohibition on the destruction of "tangible objects" encompassed illegally harvested fish.

The same restraint employed in the above cases should be employed here. Ordinary people would be shocked to learn that the Appellants' conduct was a federal *crime*. The Appellants themselves—who had no prior criminal record—certainly were. (And so was the Kuehl family). Removing a fishing line that they reasonably believed to be illegally killing protected marine life is not what ordinary people would consider "stealing." A civil tort punishable by money damages or a fine—maybe. But a federal crime punishable by up to five years in prison—no way.

That explains why the jury here *wanted* to acquit, as evidenced by its two deadlocks and question if there were "any other defense theories" available. (DE 66:1). Yet the court's instructions required the jury to convict as long as the Appellants knew that the line belonged to someone else. At the very least, even if the court's capacious definition of "stealing" was permissible, the narrower definition proposed by the Appellants—as reflected in both *Morissette* and Black's Law Dictionary (Initial Br. 36)— was also permissible. Thus, the court should have given that definition.

12

**2.** The need for interpretive restraint here is further bolstered by the term "purloin," which accompanies the term "steal" in § 661.

In their initial brief (at 20, 36–37), the Appellants argued that "purloin" requires a wrongful appropriation—*i.e.*, the taking of property for oneself. *See, e.g.*, E.A. Poe, *The Purloined Letter* (1845) (recounting how a Cabinet Minister "purloined" a letter from a member of the royal family in order to "use the document as a form of blackmail"). The Government appears to concede (at 23–24), and certainly does not dispute, that "purloin" bears this meaning. Giving that same meaning to "steal" would thus ensure that § 661 does not extend to civil trespassers.

While "steal" and "purloin" are phrased in the disjunctive, that does not require that they have independent meanings. To the contrary, the Supreme Court has recognized that "the word 'or' may be used to indicate the synonymous, equivalent, or substitute character of two words or phrases." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 255 (1994) (quotation omitted); *see also Cleveland v. United States*, 531 U.S. 12, 25–26 (2000); *United States v. Olano*, 507 U.S. 725, 732 (1993). So it is here. Indeed, the Government does not dispute that "steal" and "purloin" are just synonyms. The Appellants' instructions reflected that congruence.

13

**3.**    The Government's main (and only statutory) argument relies on the canon against surplusage. But there is no surplusage here. And, even if there was, that canon would not overcome the arguments above.

**a.**    The Government does not argue that the Appellants' reading of § 661 would create surplusage within § 661 itself. Instead, it argues that their reading would create surplusage in *other* statutes. It emphasizes (at 22–27) that other theft statutes refer to both "stealing" and "conversion." So, the argument goes, if "stealing" in § 661 required conversion, that would render "conversion" in other statutes superfluous.

But that argument fails because one can engage in conversion without engaging in stealing. Thus, reading "stealing" in § 661 to require conversion would not render superfluous the "conversion" aspect in other statutes. It would merely confirm that those statutes can be violated through "conversion" alone (without "stealing"). Meanwhile, § 661 can be violated *only* by "stealing" (or purloining), which also requires conversion.

Once again, that is how the Supreme Court in *Morissette* defined "stealing" under § 641. Ironically, the Government relies heavily on § 641 here, as it is one of the theft statutes that can be violated by "conversion" alone. But, as discussed above, *Morissette* explained that, while every

14

stealing requires conversion, not every conversion requires stealing. And, critically, the Court said that in the context of finding no surplusage.

The Government also refers (at 26–27) to 18 U.S.C. § 666, but that statute only bolsters the Appellants' point. Section 666 makes it unlawful to "embezzle[ ], steal[ ], obtain[ ] by fraud, or *otherwise* without authority knowingly convert" certain property. 18 U.S.C. § 666(a)(1)(A) (emphasis added). The use of the word "otherwise" confirms that "steal" (and the other takings) all require conversion. *See Johnson v. United States*, 576 U.S. 591, 598 (2015). Indeed, there would have been no reason for Congress to include the word "otherwise" if that were not the case. So the Government's interpretation of § 661—under which "stealing" would *not* require conversion—would *itself* render language superfluous in § 666.

The Government also relies on this Circuit's pattern jury instructions. But they are "not binding law," *United States v. Carter*, 776 F.3d 1309, 1324 (11th Cir. 2015), and they are a double-edged sword at best. For example, as the Appellants initially observed (at 37), the pattern instruction for § 659 includes a conversion requirement. The Government responds (at 34) that, unlike § 661, the text of § 659 refers to conversion. But the pattern instruction for § 659 requires conversion

15

as part of the definition of "stealing." 11th Cir. Pattern (Crim.) Instr. O23.1 (2023). And the Government does not argue that "stealing" bears one meaning in § 659 and a different one in § 661. To the contrary, its surplusage argument assumes that it bears the same meaning in both.

Moreover, and as the Appellants initially observed (at 37–38), this Circuit's pattern instruction for mail theft in 18 U.S.C. § 1708 also defines "stealing" to require conversion and keeping the property. 11th Cir. Pattern (Crim.) Instr. O66.1 (2023). But, unlike § 659, the text of § 1708 does *not* make any reference to conversion. The Government fails to explain (at 27) how that pattern instruction could possibly be correct *unless* stealing itself required conversion, just as the Appellants argue.

**b.** In any event, the Supreme Court has explained that "[t]he canon against surplusage is not an absolute rule." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). So it "does not require [courts] to avoid surplusage at all costs." *U.S. v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007). Rather, some surplusage in a statute is "only a clue" about its meaning, and "[s]ometimes the better overall reading of the statute contains some redundancy." *Rimini St., Inc. v. Oracle USA, Inc.*, 138 S. Ct. 873, 881 (2019). And such "redundancy is hardly unusual," *Marx*, 568

16

U.S. at 385 (citation omitted), in criminal statutes where "overlap" "is not uncommon," *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014).

Thus, any surplusage in the Appellants' interpretation of § 661 would not overcome their arguments above. Notably, those arguments are based in part on *Morissette*, where the Court did not see any surplusage problem with interpreting "steal" in § 641 to encompass conversion, even though § 641 expressly refers to "conversion." Just as the canon against surplusage cannot overcome the plain meaning of a statute, *Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004), it cannot overcome binding Supreme Court precedent. And the Government's reliance on the canon is particularly suspect here given that the Government's *own* interpretation would create surplusage in § 666.

## II.  The Appellants' requested instructions were not adequately covered by the willfulness instruction.

The Government's only other legal argument (at 32–34) is that the district court's willfulness instruction adequately covered the Appellants' requested § 661 instruction on "intent to steal." But it did no such thing.

The court instructed the jury to find that the Appellants "acted willfully with the intent to steal or purloin the property." (DE 64:2). And the court explained that the "word 'willfully' means that the act was

17

committed voluntarily and purposefully, with the intent to do something *the law* forbids; that is, with the bad purpose to disobey or disregard *the law*." (DE 57:11) (emphasis added). This required the jury to find that the Appellants acted with the intent to do something that "the law" forbade. And, as the court explained, "the law" forbade "stealing"—defined as a taking with the intent to deprive the owner of their property rights.

The problem, then, is clear: the willfulness instruction effectively incorporated the (deficient) "stealing" instruction. As long as the jury found that the Appellants took property that they knew belonged to someone else, the jury would have necessarily found that they willfully intended to do something the law forbade (*i.e.*, steal). But that did not cover the Appellants' requested instructions, which would have required the jury to find not only that they knowingly took someone's property but also that they did so with the intent to convert it for their own use/benefit. At no time was the jury instructed that it had to make such a finding, or that it had to acquit the Appellants if it found they lacked such intent.

The Government misses the point entirely. It argues (at 32–34) that the court's willfulness instruction allowed the Appellants to argue that they lacked the requisite *mens rea*. But it allowed them to do so *only* on

18

the theory that they did not know that the property belonged to someone else. The court's instructions, however, foreclosed any argument that they lacked the requisite *mens rea* on the theory that they did not intend to convert the property for their own use/benefit. Again, the jury would have been required to convict even if it found that they lacked such intent, because the court refused to give their requested instructions.

The closing arguments reflect that reality. As the Appellants' initial brief recounted (at 8–9), the prosecution devoted its closing argument to explaining that the Appellants knew that the fishing line belonged to someone else. After all, that's all it needed to prove to obtain a conviction under the court's instructions. Meanwhile, at no time did the Appellants urge the jury to acquit on the ground that they did not intend to convert the property for their own use/benefit. That effort would have been futile in light of the instructions the court gave—over Appellants' objections.

## III.  The Appellants' requested instructions would have required an acquittal had they been given.

The Government does not meaningfully dispute that the court's refusal to give the Appellants' requested instructions dealt with a point at trial so important that it seriously impaired their defense. Indeed, the instructions would have not only permitted but mandated an acquittal.

19

That is because, as the Appellants explained in their initial brief (at 7, 25), there was no allegation—let alone any evidence—that they interfered with the fishing line with the intent to convert it for their own use/benefit. The Government does not dispute that. Nor could it. The prosecution conceded during the charge conference that it was not "riding on conversion here, obviously." (DE 146:5). The prosecution admitted during closing that the Appellants' "motive" was to free the sharks from the line (not to take any property for themselves or others). (*Id.* at 206). And the prosecution's own eye-witness, Leslie Kuehl, confirmed that this was the Appellants' sole motivation. (DE 145:198–99). Thus, had the jury been instructed that it had to find some element of conversion to find the requisite intent to steal or purloin, it would have been required to acquit.

And that is the result the jury wanted to reach anyway. Remarkably, the Government's brief (including its factual background) omits any mention of the extensive jury deliberations. *See* Initial Br. 5, 15–18. But it is critical to remember how close this trial was even *without* the Appellants' requested instructions: the jury deliberated for longer than the trial itself; the jury *twice* reported being deadlocked (and

20

received an *Allen* charge) (DE 62, 63, 65); and the jury sent back *seven* notes carefully scrutinizing and literally parsing the court's instructions.

In the most revealing note, the jury asked if there were "any other defense theories" relating to the offense elements (DE 66:1). As the Appellants' initial brief recounted (at 13–14, 22–23), their proposed theory-of-defense instruction would have told the jury that they lacked the intent to steal or purloin if they did not take property for their own use or benefit. Over their objection, however, the district court's truncated theory-of-defense instruction provided that their *only* defense was that they lacked "the bad purpose to disobey or disregard the law and therefore did not act with the intent to steal or purloin." (DE 57:12). This did no more than repeat the court's willfulness instruction, which incorporated "the law" on "stealing," as defined in the offense instruction.

As the Appellants explained (at 25–26), and the Government does not dispute, the jury's note—asking if there were "any other defense theories"—confirms that it was searching for a legal basis to acquit. Had the court given the Appellants' requested instructions, requiring the jury to find that they took the property for their own use/benefit, the jury

would have jumped at the chance to acquit. Indeed, it would have been *required* to do so given the complete lack of any evidence on conversion.

Thus, the Government does not argue that any error here was harmless. (The word "harmless" does not appear even once in its brief). Nor could it credibly do so. To show that the court's erroneous failure to given the Appellants' requested instructions was harmless, the Government would have to prove that, based on the evidence at trial, no rational jury could have acquitted had it been properly instructed. *See United States v. Takhalov*, 827 F.3d 1307, 1320–21 (11th Cir. 2016). As explained, not only could a rational jury have acquitted the Appellants; it would have had no choice to do so given the lack of conversion evidence.

**IV.    The Government's attempt to retry the case backfires.**

**1.**    Unable to argue harmless error, yet still seeking some way to insulate the convictions, the Government resorts to pure atmospherics. It spends the last pages of its brief (at 34–36) re-litigating "[t]he weight of the trial evidence." Yet, in the same breath (at 34), the Government acknowledges that this "is not an issue in this appeal." Indeed, the Government's arguments have no legal relevance to the only question presented here: whether the court's failure to give the Appellants'

22

requested jury instructions was reversible error. The only apparent reason for including this irrelevant argument is to persuade this Court that the Appellants had a criminal intent and deserved to be prosecuted and convicted. But this Court is neither a grand jury nor a petit jury.

**2.**     In any event, the Government's effort to retry this case on appeal backfires. Remarkably, the Government still has no answer for a key, undisputed fact: the Appellants were in constant communication with the authorities about what they were doing. As they recounted in their initial brief (at 9–10), there was overwhelming evidence at trial that the Appellants (along with their colleague Janelle on shore) advised the authorities by radio/phone, email, and in person over the course of four hours that they were cutting what they believed to be an illegal shark-killing fishing line. It was not until the end that the authorities first suggested that the Appellants might have broken the law. The Government fails to acknowledge that this undisputed behavior by the Appellants is wildly inconsistent with criminal (or "felonious") intent.

Unable to explain their exculpatory self-reporting, the Government asserts (at 35) that telling the Kuehl family that the line was illegal did not necessarily mean that the Appellants *themselves* believed that the

23

line was illegal. But, once again, the Appellants reported their own activity to law enforcement, reflecting their *own belief* that the line was illegal. And, as the Appellants recounted in the initial brief (at 11), it was undisputed that the Appellants affirmatively enlisted the Kuehls—including two police officers!—in their effort to retrieve and cut the line. They even allowed the Kuehls to take video and document the sharks being freed. Why would the Appellants create eye-witnesses and video evidence if they thought they were committing a crime? The Government does not try to reconcile that undisputed conduct with criminal intent.

Ignoring that aspect entirely, the Government asserts (at 34–35) that the Appellants concocted a false story about an illegal fishing line just to "please their customers." But this assertion is so implausible that the prosecution itself did not make it at trial. Indeed, at no point did the prosecution argue that the Appellants made up a story about an illegal line for the purpose of obtaining positive customer reviews. Rather, the prosecution argued that the Appellants' "motive" was to "cut the sharks off" the line (DE 146:206), and that they used the Kuehls to help them do that. (*Id*. at 170 ("They duped the Kuehl family to help them in a criminal act.")). After all, it took the entire crew several *hours* to haul in and cut

24

the line—and that was *after* they had already completed a successful shark dive. To be sure, the Kuehls *did* get a thrill out of freeing the sharks. But nobody seriously thinks that the Appellants invented a false story about an illegal fishing line—a line that they stumbled upon in the open ocean with dying marine life on it—and then spent several hours retrieving and cutting the line just to get a positive review on Yelp.

Nor is there any doubt that the Appellants reasonably believed that the fishing line was in fact illegal. After all, even the Government's own witness—the NOAA observer—acknowledged that, based on the lack of any official markings, "there was nothing that would show someone boating by that this line belonged to someone with a special NOAA permit." (DE 145:41–42, 44–45). And the Appellants had no reason to suspect this: NOAA permits for shark research were "rare," with less than ten total permits issued per year. (DE 144:54, 206; DE 145:38). (Even if the Appellants somehow knew which vessels had a permit, the line here was attached to a buoy bearing the name of the *wrong* vessel).

The Government also makes other arguments that it did not make at trial. For example, it asserts (at 36) that Mr. Moore "misdirected the authorities when he said that the line may have come from a green boat."

25

But that was not the prosecution's argument at trial. Rather, the prosecution argued in closing that the reference to a green boat meant that the Appellants knew that the line belonged to someone and was not abandoned. (DE 146:152). But, as defense counsel explained in closing, the fact that Mr. Moore volunteered this information to law enforcement is only further evidence that "[h]e's trying to help. He thinks he's doing the right thing." (*Id*. at 178). This too is inconsistent with criminal intent.

Similarly, the Government reiterates (at 36) that the gear and bait on the line were fresh, indicating that the line belonged to someone else and was therefore not abandoned. But that does nothing to undermine the Appellants' belief that the line was *illegal*. And if the line was being actively fished, then that would explain why the Appellants believed that this was an exigent circumstance requiring their immediate intervention. They needed to act quickly to prevent irreparable harm—*i.e.*, death.

The Government also refers (at 36) to Mr. Moore cutting the line on the dock. (He did not want people to step on the hooks). But the only reason the line was on the dock in the first place was because Mr. Moore brought it there, as instructed by the Fish & Wildlife officer. And contrary to the prosecutor's argument in closing, Mr. Moore did not "throw away

26

the evidence" in a dumpster. (DE 146:149–50). As the Government now acknowledges (at 15), the prosecution's own witness, the dock master, testified that *he* (not Mr. Moore) directed his employees to throw the line in a dumpster after it had been sitting on the dock for several *hours*. (DE 144:237–38). When that officer finally asked where the line was— again, several hours later—Mr. Moore accurately informed him that it had been placed in a dumpster, allowing the officer to recover what was left. (DE 145:246, 248, 265–67, 273–74). Complying with the officer's direction to bring the line to the dock, and then informing the officer where someone else had moved it, is inconsistent with criminal intent.

The officer's own actions bolster the point. Despite knowing that Mr. Moore had been cutting the line, the officer described his initial encounter with Mr. Moore as "consensual," admitting that he had "no reason to stop him" and did not activate his lights. (DE 145:229–30). Although the vessel was "absolutely covered in line," which did not "look right," the officer testified that he did not have any basis to seize the line as evidence (which would have ensured its preservation and return to the owners). So he instead directed Mr. Moore himself to bring the line to the

27

dock, which he did. (*Id*. at 231, 240–41, 261–62). And the officer was so indifferent about the line that he did not follow up on it until *hours* later.

**3.** Against all of this evidence, the Government's only argument (at 35–36) is that an orange buoy marked in faded letters (again, bearing the name of the wrong vessel) was brought on board with the line but was not ultimately recovered. The prosecution speculated that the Appellants discarded the buoy before Mr. Moore met with the Fish & Wildlife officer. But one of the Kuehls testified that the buoy "was on the boat at the end." (DE 145:71). And another Kuehl testified that the officer's pictures (which did not show the buoy) did not "scan[ ] the entire boat." (*Id*. at 218). Despite there being an entire (law-enforcement) family on board, there was no evidence that anyone saw the Appellants discard the buoy.

But even assuming that a jury could infer that one of them did so, that would suggest (at best) *only* that they knew that the line belonged to someone else and was not abandoned. Indeed, that is what the prosecution itself argued in closing. (DE 146:158). And that is what the Fish & Wildlife officer testified. (DE 145:234 ("So if there was a marking on there, it would be very clear that, hey, this belongs to somebody.")). Worst case, then, the evidence was legally sufficient to prove that the

28

Appellants knew that the fishing line belonged to someone and took it anyway. But there was still no evidence that the Appellants believed that the line was *legally* deployed. Thus, when it comes to their intent, the evidence was overwhelming that they interfered with the line to stop what they reasonably believed to be an illegal shark-killing operation.

\*   \*   \*

Although the Appellants committed this non-felonious taking, they now find themselves convicted felons. That unjust result is due to the district court's ruling that they possessed an "intent to steal" for purposes of § 661 by intentionally depriving someone of their property rights (even just temporarily). Had the court instead instructed the jury that it also had to find that they intended to take the property for the use or benefit of themselves or others, as the Appellants had requested, the jury would have acquitted in a heartbeat. That result would have tracked a narrower and established conception of "stealing." And it would have comported with an ordinary person's common-sense understanding that what the Appellants did here—while perhaps a civil tort—was not a federal crime.

29

# CONCLUSION

Mr. Moore and Mr. Mansell respectfully request that the Court vacate their § 661 convictions and remand for a new trial.

Respectfully submitted,

ASHLEY M. LITWIN
SEITLES & LITWIN, P.A.
Counsel for Moore
40 N.W. 3rd St. PH
Miami, FL 33128
(305)403-8070

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

*/s/ Andrew L. Adler*
ANDREW L. ADLER
ASS'T FEDERAL PUBLIC DEFENDER
Counsel for Mansell
1 E. Broward Blvd., Suite 1100
Ft. Lauderdale, FL 33301
(954) 356-7436

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 6,326 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in New Century Schoolbook 14-point font.

*/s/ Andrew L. Adler*

**CERTIFICATE OF SERVICE**

I certify that on this 8th day of January 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and it is being served this day via CM/ECF on Jonathan D. Colan, Assistant U.S. Attorney, 99 N.E. 4th Street, Suite 523, Miami, FL 33132.

*/s/ Andrew L. Adler*