## No. 23-10579-GG

===

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

———————

## UNITED STATES OF AMERICA,
### *Plaintiff/appellee*,

### v.

## JOHN R. MOORE, JR. &
## TANNER J. MANSELL
### *Defendants/appellants*.

———————

## On Appeal from the United States District Court
## for the Southern District of Florida

———————

## PETITION FOR REHEARING EN BANC
## BY APPELLANTS MOORE & MANSELL

———————

**ASHLEY M. LITWIN**
SEITLES & LITWIN, P.A.
**Counsel for Moore**
**40 N.W. 3RD ST. PH 1**
**Miami, FL 33128**
**(305) 403-8070**

**HECTOR A. DOPICO**
 FEDERAL PUBLIC DEFENDER
**ANDREW L. ADLER**
 ASS'T FEDERAL PUBLIC DEFENDER
**Counsel for Mansell**
 1 E. Broward Blvd., Suite 1100
 Ft. Lauderdale, FL 33301
 (954) 356-7436

## THIS CASE IS ENTITLED TO PREFERENCE
## (CRIMINAL CASE)

===

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

## United States v. Moore & Mansell
## Case No. 23-10579-GG

The Appellants file this Certificate of Interested Persons and Corporate Disclosure Statement, as required by 11th Cir. R. 26.1.

Adler, Andrew L.

Altonaga, Alyssa Maria

Caruso, Michael

Colan, Jonathan D.

Dopico, Hecto A.

Goldstein, Jeremy

Gonzalez, Juan Antonio,

Kirkpatrick, Lynn

Lapointe, Markenzy

Litwin, Ashley M.

Mansell, Tanner

Matthewman, Hon. William

Matzkin, Daniel

McCabe, Hon. Ryon M.

McMillan, John

Moore, Jr., John R.

Otazo-Reyes, Hon. Alicia M.

Reinhart, Hon. Bruce E.

Rivero, Laura Thomas

Rubio, Lisa Tobin

Seitles, Marc David

Watts-Fitzgerald, Thomas A.

United States of America

## EN BANC STATEMENT OF COUNSEL

In support of this petition, and pursuant to 11th Cir. 35-5, undersigned counsel for the appellants express a belief, based on a reasoned and professional judgment, that the panel decision is contrary to the following decisions of the Supreme Court of the United States:

- *Dubin v. United States*, 559 U.S. 110 (2023), and the many Supreme Court precedents cited in Part II(E) of the opinion;

- *Morissette v. United States*, 342 U.S. 246 (1952); and

- *United States v. Turley*, 352 U.S. 407 (1957).

Counsel also expresses a belief, based on a reasoned and studied professional judgment, that this appeal involves the following question of exceptional importance to the administration of justice:

Whether a person acts with "intent to steal or purloin" for purposes of the felony offense in 18 U.S.C. § 661 where he takes property belonging to someone else with intent to deprive them of their use or benefit of it, even if he does not take the property for the use or benefit of himself or anyone else.


*/s/ Ashley M. Litwin*  
Counsel for Moore

*/s/ Andrew L. Adler*  
Counsel for Mansell

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................... C-1

EN BANC STATEMENT OF COUNSEL ....................................................i

TABLE OF CITATIONS ........................................................ iii

STATEMENT OF THE ISSUE MERITING EN BANC REVIEW ...........1

INTRODUCTION ....................................................................2

COURSE OF PROCEEDINGS, FACTS & DISPOSITION OF CASE .....4

    A.    The Facts ....................................................................4

    B.    The Proceedings Below ....................................................5

    C.    The Appeal ....................................................................7

ARGUMENT & AUTHORITIES ...............................................11

    A.    Supreme Court precedent requires that federal criminal statutes like § 661 be strictly construed ...................................11

    B.    Supreme Court precedent on "stealing" confirms that the jury instructions here were overbroad .....................................14

        1.    *Morissette* ..........................................................15

        2.    *Turley* ................................................................17

CONCLUSION .......................................................................19

CERTIFICATE OF COMPLIANCE ........................................20

CERTIFICATE OF SERVICE ................................................21

APPENDIX: PANEL OPINION ....................................... App.

# TABLE OF CITATIONS

## **Cases**

*Allen v. United States*,
   164 U.S. 492 (1896) ................................................................. 7

*Dubin v. United States*,
   559 U.S. 110 (2023) ............................................. i, 11–12, 14

*Johnson v. Terry*,
   119 F.4th 840 (11th Cir. 2024) ........................................... 17

*Marinello v. United States*,
   584 U.S. 1 (2018) ................................................................. 13

*Morissette v. United States*,
   342 U.S. 246 (1952) ............................................ i, 7, 9, 15–17

*United States v. Dupree*,
   57 F.4th 1269 (11th Cir. 2023) (en banc) ........................... 15

*United States v. Hill*,
   119 F.4th 862 (11th Cir. 2024) ........................................... 17

*United States v. McRee*,
   7 F.3d 976 (11th Cir. 1993) (en banc) ................................. 17

*United States v. Turley*,
   352 U.S. 407 (1957) .......................................... i, 8, 17–18

*Van Buren v. United States*,
   593 U.S. 374 (2021) ............................................................. 12

*Yates v. United States*,
   574 U.S. 528 (2015) ............................................................. 13

## **Statutes**

18 U.S.C.
    § 641 ............................................................................. 15–16
    § 661 ............................................................ i, 1, 6, 8, 10–11, 13–15, 17

## **Other Authorities**

Black's Law Dictionary (8th ed. 2004) .................................................... 14

## STATEMENT OF THE ISSUE MERITING EN BANC REVIEW

Whether the district court correctly instructed the jury about the "intent to steal or purloin" required to convict under 18 U.S.C. § 661.

## INTRODUCTION

This is an exceptional criminal case warranting en banc review.

This case exists because of egregious prosecutorial overreach. Judge Lagoa, joined by Judge Grant, issued a concurrence lambasting the government for bringing this prosecution. And rightfully so. The government charged the appellants with the felony offense of "stealing" a fishing line. But the appellants plainly lacked any criminal intent. They interfered with the line only because they reasonably believed that it was illegally killing sharks. Remarkably, they even informed the authorities about what they were doing and had bystanders document their conduct.

Juries are supposed to check this sort of prosecutorial overreach. Here, the jury's extensive deliberations, including its seven notes to the court and multiple deadlocks, make clear that it did not want to convict. After all, who would? But, in the end, the jury was left with no choice but to convict because the district court defined "stealing" in the broadest possible way. As long as the jury found that the appellants knew that the fishing line belonged to someone else and took it, then they engaged in "stealing." The reason why they took the fishing line was legally irrelevant. As a result, two upstanding citizens are now branded "felons."

2

Fortunately, the law does not require this unjust result. To the contrary, there is a long line of Supreme Court precedent requiring federal criminal statutes to be strictly construed. And the entire point of this precedent is to safeguard against prosecutorial overreach and ensure that ordinary people have fair notice about what conduct is made criminal. If any case requires such interpretive restraint, it is this one.

The panel, however, failed to apply such restraint. In fact, the panel did not mention this line of Supreme Court precedent at all. That oversight is especially troubling given that the appellants had relied on that precedent, the panel acknowledged that the plain text of the statute did not require upholding the convictions, and two panel members agreed that the prosecutor's overreach deprived the appellants of any fair notice.

The panel nonetheless believed that it was powerless to remedy this injustice because of a single Supreme Court case from 1957. But, as explained below, that case did not mandate the broadest possible jury instructions sweeping in the appellants' non-criminal taking. Meanwhile, a different precedent directly supported their more restrained reading.

To ensure adherence to Supreme Court precedent, and to avert an unnecessary miscarriage of justice, en banc review is warranted here.

3

**COURSE OF PROCEEDINGS, FACTS & DISPOSITION OF CASE**

    **A.    The Facts**

The appellants worked for a shark-diving company in Jupiter, Florida. In August 2020, they took the Kuehl family—on vacation from Kansas City, two of whom were police officers—out to swim with sharks. On their way back to shore, the appellants saw a buoy in the middle of the ocean. Attached to the buoy was a fishing longline. The appellants believed that this line was illegally killing sharks and other marine life.

To save the sharks, the appellants spent the next few hours pulling the line into the boat and cutting off the hooks and sharks caught on the hooks. The appellants enlisted the Kuehls to assist in this effort. As this was happening, the appellants, along with their colleague back on shore, were in constant communication with Florida Fish & Wildlife and NOAA about what they were seeing and doing. Excited to be saving sharks, the Kuehls filmed the episode and posted videos on their social media. The appellants also directed the Kuehls to document the sharks being freed.

On their way back to shore, Mr. Moore and the Kuehls encountered the Fish & Wildlife officer. This encounter was captured on video. Piles of fishing line were visible on the boat. At no time did the officer seem

4

upset or suggest they had done anything wrong. Rather, the officer directed Mr. Moore to bring the line back to the dock, which he did. After the fishing line just sat on the dock for hours, with no follow-up from law enforcement, the dock master directed his employees to throw it in the dumpster. Mr. Moore later told the authorities where they could find it.

As it turned out, the fishing line was legal. The owner of a fishing vessel, the *Day Boat III*, had received a rare permit from NOAA to set the line so that the government could research sandbar sharks. However, there were no official markings that would have alerted anyone that the line was legal. As a result, the government's own witness—the NOAA observer on the *Day Boat III*—acknowledged that it would have been reasonable to believe that the line was illegal. All told, the owner of the fishing vessel lost a little more than $3,000. There was no allegation or evidence that the appellants took the property for the use or benefit of themselves or anyone else; rather, they did so only to save the sharks.

### B.    The Proceedings Below

The appellants would have been happy to simply pay for the damage caused by their good-faith mistake. But the government inexplicably decided to make a federal criminal case out of this. The

5

government charged the appellants with one count of property theft within the special maritime jurisdiction of the United States, in violation of 18 U.S.C. § 661. This is a felony carrying up to five years in prison.

The appellants went to trial. The only dispute was whether they possessed the requisite "intent to steal or purloin" under § 661. Boiled down, the prosecution's theory was that the appellants stole because they knew that the fishing line belonged to someone, and they took it anyway. The appellants, meanwhile, essentially argued that they did not steal because they took the property for a valid reason—namely, to save the marine life that they reasonably believed was being illegally slaughtered.

The district court's jury instructions, however, precluded the jury from accepting the appellants' defense. The court defined "steal" as "to wrongfully take property belonging to someone else with the intent to, either permanently or temporarily, deprive the owner of his right to the property or the use or benefit from it." (DE 57:9). Under this instruction, the *reason* for the taking was irrelevant. The appellants had thus urged the court to instruct the jury—as part of both the offense instruction and their theory of defense—that "stealing" also required them to take the property "with the intention to keep [it] wrongfully," or "for his own use

6

or benefit or the benefit or use of others." (DE 53:16–17, 24). But the district court refused to give these requested instructions. (DE 146:4–9).

The jury thus had no choice but to convict. As long as it found that the appellants knew the fishing line belonged to someone and took it, they had the requisite "intent to steal." But the jury clearly did not want to convict. It deliberated for longer than the trial itself, twice reported being deadlocked, and received an *Allen* charge. In its seventh and final note, the jury asked if there were "any other defense theories" available. But the only defense on which it was instructed was this: the appellants lacked an "intent to steal or purloin" if they took the property "without the bad purpose to disobey or disregard the law." (DE 57:12). But "the law" prohibited "stealing," as the court had expansively defined it. So the jury could not acquit even if it found that the appellants took the property for a valid reason and not for the use or benefit of themselves or others.

### C.    The Appeal

**1.**    On appeal, the appellants argued that the district court erred by refusing to give their requested instructions on "stealing." As relevant here, they made the following arguments. First, they argued that their proposed definition of "stealing" was taken verbatim from *Morissette v.*

*United States*, 342 U.S. 246, 271 (1952). Second, they argued that, under *United States v. Turley*, 352 U.S. 407 (1957), the taking had to be "felonious"—*i.e.*, one done with criminal intent—and the court's instructions failed to require such intent. Third, they argued that, under Supreme Court precedent, this Court was required to strictly construe § 661 to avoid sweeping in conduct that ordinary people would not think is criminal. Finally, they argued that their narrower construction was also supported by the word "purloin," which required misappropriation.

**2.**      Following oral argument, the panel affirmed the appellants' felony convictions in a published opinion on the sole ground that their proposed jury instructions were legally incorrect. Panel Op. 11, 14. The panel acknowledged that the term "steal" was "not necessarily clear on its face, so the plain text does not require a specific outcome." Panel Op. 11. The panel, however, believed that the Supreme Court's decision in *Turley* and its progeny expansively defined "stealing" in other contexts to require no more than a taking with intent to deprive the owner of the rights and benefits of their property. And this did not require that the taking be done *lucri causa* (for the benefit or use of the taker). Panel Op. 11–12. Meanwhile, the panel believed that the definition of "stealing"

8

from *Morissette* on which the appellants relied was inapt. Panel Op. 12–13. The panel did not address the appellants' arguments about "purloin" or, more importantly here, that penal statutes must be strictly construed.

**3.**    Judge Lagoa, joined by Judge Grant, authored a remarkable concurring opinion criticizing the prosecutor's decision to bring this case.

She wrote that the appellants were the "only felons I have ever encountered in my eighteen years on the bench and three years as a federal prosecutor who called law enforcement to report what they were seeing and what actions they were taking in real time. They are felons who derived no benefit, and in fact never *sought* a derive a benefit, from the conduct that now stands between and exercising the fundamental rights from which they are disenfranchised. What's more, they are felons for having violated a statute that no reasonable person would understand to prohibit the conduct they engaged in." Concurring Op. 1 (Lagoa, J.).

"For reasons that defy understanding," Judge Lagoa continued, the prosecutor took "a page out of Inspector Javert's playbook" by charging the case. *Id*. at 2–3. In her view, the facts "plainly suggest[ed] a good-faith mistake on Moore and Mansell's part" that was not "worth the public expense of a criminal prosecution, and the lifelong yokes of felony

convictions, rather than imposition of a civil fine." *Id*. at 3. In other words, this was an "imprudent exercise of [prosecutorial] discretion." *Id*. at 4.

Judge Lagoa concluded by offering a series of hypotheticals illustrating how the government had "stretch[ed] [§ 661] to its farthest possible application in this case." *Id*. She explained that, under the jury instructions in this case, a man would commit "stealing" if he saw an elderly woman being robbed, took the robber's gun, and kept it until the police arrived. *Id*. at 5. The same result would follow even if he called the police during the incident and told them he was holding the gun so that the robber could not harm the victim. *Id*. at 6. And the same result would follow even if, unknown to the man, the robbery was just a scene put on by actors. *Id*. Under the instructions, "all that matters is that [the] man took the 'robber's' property with the intent to deprive him of it," even if he reasonably but mistakenly thought he was foiling a violent crime. *Id*.

The appellants wholeheartedly agree with Judge Lagoa that this case should never have been prosecuted. They likewise agree with her understanding of the sweeping scope of the jury instructions. However, they disagree with the panel's conclusion that those instructions were legally correct, rendering this Court powerless to rectify this injustice.

10

## ARGUMENT & AUTHORITIES

This Court should rehear this case to avert a miscarriage of justice and to bring this Court's precedent in line with Supreme Court precedent.

### A. Supreme Court precedent requires that federal criminal statutes like § 661 be strictly construed.

The fundamental flaw in the panel opinion is that it disregarded binding Supreme Court precedent requiring that federal criminal statutes be strictly construed. Although the appellants repeatedly relied on this Supreme Court precedent (*see* Initial Br. 3–4, 20, 35–36; Reply Br. 2, 10–12), the panel opinion curiously made no mention of it at all.

The Supreme Court most recently summarized and applied this doctrine in *Dubin v. United States*, 599 U.S. 110 (2023), with Part II(E) synthesizing the Court's many precedents in this area. Here are a few select quotes most relevant here. "This Court has traditionally exercised restraint in assessing the reach of a federal criminal statute." *Id.* at 129 (quotations omitted). "This restraint arises both out of deference to the prerogatives of Congress and out of concern that a fair warning should be given to the world in language that the common world will understand of what the law intends to do if a certain line is passed. After all, crimes

are supposed to be defined by the legislature, not by clever prosecutors riffing on equivocal language." *Id*. at 129–30 (cleaned up). "Time and again, this Court has prudently avoided reading incongruous breadth into opaque language in criminal statutes" in order to avoid "the far-reaching consequences of the Government's reading." *Id*. at 130 (quotation omitted). "Finally, the Government makes a familiar plea: There is no reason to mistrust its sweeping reading, because prosecutors will act responsibly. To this, the Court gives a just-as-familiar response: We cannot construe a criminal statute on the assumption that the Government will use it responsibly." *Id*. at 131 (quotations omitted).

A few concrete examples help illustrate the point. In the following cases, the Supreme Court exercised interpretive restraint because an expansive reading of the federal criminal statute would have swept in conduct that no ordinary person would have thought was covered:

- In *Dubin*, the Supreme Court rejected the government's expansive reading of the aggravated identity theft statute that would have covered *any* use of someone's identity to submit a bill. 599 U.S. at 130 ("The Government's reading would sweep in the hour-inflating lawyer, the steak-switching waiter, the building contractor who tacks an extra $10 onto the price of the paint he purchased.").

- In *Van Buren v. United States*, 593 U.S. 374 (2021), the Supreme Court rejected the government's expansive reading of the Consumer Fraud and Abuse Act (CFAA) that would have covered a

"breathtaking amount of commonplace computer activity" that is routinely committed by "millions of otherwise law-abiding citizens." *Id*. at 393–94 ("So on the Government's reading of the statute, an employee who sends a personal e-mail or reads the news using her work computer has violated the CFAA.").

- In *Marinello v. United States*, 584 U.S. 1 (2018), the Supreme Court rejected the government's expansive reading of an obstruction provision in the Internal Revenue Code that would have "cover[ed] virtually all governmental efforts to collect taxes." *Id*. at 4; *see id*. 10 ("Interpreted broadly, the provision could apply to a person who pays a babysitter $41 per week without withholding taxes, leaves a large cash tip in a restaurant, fails to keep donation receipts from every charity to which he or she contributes, or fails to prove every record to an accountant.").

- In *Yates v. United States*, 574 U.S. 528 (2015), the Supreme Court rejected the government's expansive reading of a provision in the Sarbanes-Oxley Act focused on preserving "records" and "documents" that would have covered "physical objects of every kind," including a fish. *Id*. at 531–32, 536, 540 (plurality opinion).

This canon of interpretive restraint was tailor made for this case. The appellants lacked fair notice because "no reasonable person would understand [§ 661] to prohibit the conduct they engaged in." Concurring Op. 1 (Lagoa, J.). Indeed, no ordinary person would think that they were "stealing" by interfering with an ostensibly illegal fishing line for the exigent purpose of saving dying marine life. Rather, the appellants find themselves convicted felons because of the very type of prosecutorial overreach that the canon of restraint was designed to protect. Brought by

"clever prosecutors riffing on equivocal language," this case perfectly illustrates why the Supreme Court has consistently refused to broadly interpret federal criminal statutes on the assumption that "prosecutors will act responsibly." *Dubin*, 599 U.S. at 129–31 (quotations omitted).

### B. Supreme Court precedent on "stealing" confirms that the jury instructions here were overbroad.

There are only two possible reasons why the canon of restraint might not apply in a given case. But neither of them apply to this one.

*First*, the canon could not overcome unambiguous statutory text. But, here, the panel expressly acknowledged that the term "steal" in § 661 was "not necessarily clear on its face, so the plain text does not require a specific outcome." Panel Op. 11. As the appellants explained, even legal dictionaries supported their proposed definition of "stealing" as taking property "with the intent to keep it unlawfully." Initial Br. 36 (quoting Black's Law Dictionary 1453 (8th ed. 2004)); (*see* DE 53:17).

*Second*, the cannon could not overcome binding Supreme Court precedent about "stealing." But no such precedent required the panel to accept the government's expansive interpretation here. To the contrary, the relevant precedent on "stealing" supports the appellants' narrower interpretation and confirms the over-breadth of the jury instructions.

14

1.    *Morissette*

In *Morissette*, the Supreme Court said this: "To steal means to take away from one in lawful possession without right with the *intention to keep wrongfully*." 342 U.S. at 271 (quotation and other emphasis omitted). By explaining what stealing "means," *Morissette* provided an exclusive definition. *See United States v. Dupree*, 57 F.4th 1269, 1277 (11th Cir. 2023) (en banc). And that definition excludes the taking here.

The panel, however, believed that *Morissette* was "not explicitly relevant" because it involved 18 U.S.C. § 641. Panel Op. 12. But § 641 and § 661 are neighboring statutes that were enacted in the same 1948 Act of Congress. And because they both use the word "steal," there is no basis to give that word a different meaning in § 661 than it has in § 641.

The panel observed that, unlike § 661, § 641 prohibits "conversion" as well as "stealing." Panel Op. 12. But the panel failed to explain why that supports giving "stealing" a narrower meaning under § 641 than under § 661. If anything, the fact that § 641 prohibits "conversion" in addition to "stealing" suggests that § 641 is *broader* than § 661.

Rather than articulate any reason why "stealing" under § 661 would have a different meaning than "stealing" under § 641, the panel stated

15

that *Morissette* did not provide a "conclusive definition" of "stealing" even for § 641. Panel Op. 13. The panel observed that *Morissette* took its definition from a New York case. But the panel failed to explain why the Court could not adopt a federal definition for § 641 from a state case.

The panel also observed that, in the preceding sentence, *Morissette* stated that "[p]robably every stealing is a conversion, but certainly not every knowing conversion is a stealing." 342 U.S. at 271. The panel seized on the word "probably." But use of the word "probably," at most, indicated uncertainty about the precise overlap between stealing and conversion, not about the definition of "stealing" that came in the very next sentence.

Finally, the panel thought *Morissette*'s discussion about stealing was merely "background context" and "dicta." Panel Op. 12–13. But *Morissette*'s holding was that "conversion" under § 641 had an intent element. In so holding, the Court rejected the government's argument that this would render "stealing" superfluous. It was in that context that the Court exclusively defined "stealing." *See Morissette*, 342 U.S. at 271–73. That reasoning therefore formed part of the Court's holding. Indeed, that is how this Court has long understood *Morissette*, stating that the elements of § 641 require a taking for one's "own use or the use of others."

16

*United States v. Hill*, 119 F.4th 862, 866–67 (11th Cir. 2024) (quoting *United States v. McRee*, 7 F.3d 976, 980 (11th Cir. 1993) (en banc)).

At the very least, this Court has repeatedly stressed that Supreme Court dicta cannot be lightly cast aside. *Johnson v. Terry*, 119 F.4th 840, 861 n.7 (11th Cir. 2024) (citing cases). But that is exactly what the panel did here. Worst case scenario, then, *Morissette* directly supports rather than precludes the appellants' argument that the term "stealing" in § 661 should have been strictly—not expansively—construed by the panel.

### 2. *Turley*

The panel believed that *Turley* was "more applicable" than *Morissette*. Panel Op. 13. But that is incorrect given that *Turley* interpreted the National Motor Vehicle Act whereas *Morissette* interpreted a neighboring theft statute enacted at the same time as § 661.

In any event, *Turley* said that "'stolen' . . . includes all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership." 352 U.S. at 417. But this (non-exclusive) definition does not encompass *every* taking with intent to deprive the owner of their property—regardless of the reason. That is so because *Turley*'s definition still requires that the taking be "felonious." And, as

17

*Turley* itself explained, "felonious" in this context refers to "having criminal intent." *Id*. at 410 n.4. That is a critical aspect of *Turley*'s definition because it ensures that civil torts are not punished as crimes.

The panel did not meaningfully address this key point. Instead, the panel emphasized that *Turley* held that "stolen" was broader than common-law larceny; and because *lucri causa* (taking for gain's sake) was one element of common-law larceny, it was excluded from *Turley*'s definition. Panel Op. 12. But *Turley* did not address that issue (or whether the reason for the taking matters). Rather, it held only that the statute there was not limited to common-law larceny and thus included embezzlement. Meanwhile, *Turley*'s "felonious" taking requirement refutes the notion that "stolen" includes takings lacking criminal intent.

Here, to ensure that the appellants were convicted for a "felonious taking" under *Turley*, the jury should have been instructed that the appellants took the property for their own use or benefit. Just because that resembled one element of common-law larceny does not mean it may be dispensed with where, as here, it is necessary to avoid transforming what was (at worst) a civil tort into a felony. Nothing in the instructions here required the jury to find the "criminal intent" needed under *Turley*.

18

## CONCLUSION

The panel opinion should be vacated and the case reheard en banc.

Respectfully submitted,

ASHLEY M. LITWIN                  HECTOR A. DOPICO
SEITLES & LITWIN, P.A.            FEDERAL PUBLIC DEFENDER
Counsel for Moore
40 N.W. 3rd St. PH               */s/ Andrew L. Adler*
Miami, FL 33128                  ANDREW L. ADLER
(305)403-8070                     ASS'T FEDERAL PUBLIC DEFENDER
                                  Counsel for Mansell
                                  1 E. Broward Blvd., Suite 1100
                                  Ft. Lauderdale, FL 33301
                                  (954) 356-7436

19

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A), because it contains 3,823 words, excluding the parts of the brief exempted by 11th Cir. R. 35-1. I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in New Century Schoolbook 14-point font.

*/s/ Andrew L. Adler*

## CERTIFICATE OF SERVICE

I certify that, on this 16th day of December 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and it is being served this day via CM/ECF on Jonathan D. Colan, Assistant U.S. Attorney, 99 N.E. 4th Street, Suite 523, Miami, FL 33132.

*/s/ Andrew L. Adler*

# APPENDIX: PANEL OPINION

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10579

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOHN R. MOORE, JR.,
TANNER J. MANSELL,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:22-cr-80073-DMM-2

_____

Before WILSON, GRANT, and LAGOA, Circuit Judges.

WILSON, Circuit Judge:

Defendants-Appellants John Moore, Jr., and Tanner Mansell jointly appeal their convictions for theft of property within special maritime jurisdiction, in violation of 18 U.S.C. § 661. Their sole argument centers on the district court's refusal to give their requested jury instruction—that the jury must find that Moore and Mansell stole the relevant property for the use or benefit of themselves or others, i.e., *lucri causa*, to convict them under § 661. After careful review, and with the benefit of oral argument, we affirm.

## I.    Background

Moore and Mansell worked as boat crew for a company that facilitated shark encounters in Jupiter, Florida. On August 10, 2020, the Kuehl family was taken out by Moore and Mansell to snorkel with sharks. During the trip, Moore and Mansell spotted a long fishing line attached to a marked buoy, which they hauled into the boat with the help of the Kuehls. The Defendants told the Kuehls they had stumbled upon an "illegal longline fishing line," and there were sharks caught on the line. In the process of gathering the line into the boat, Moore and Mansell cut the sharks caught in the hooks free.

Unbeknownst to Moore and Mansell, the line was properly placed. Scott Taylor, who ran a seafood-distribution business and was the owner of *Day Boat III*, had received the proper permit with the National Oceanic and Atmospheric Administration to conduct shark research. The *Day Boat III* was specially rigged for such work.

As part of its research, the boat used a main line with attached hooks for catching sharks and fish that was weighed down to the sea bottom using anchors and connected to buoys, one of which was far off from the boat.  Taylor explained at trial that, after the *Day Boat III* returned from a trip on August 10, 2020, it had lost certain bits of its gear.

While retrieving the line, Moore and Mansell encouraged the Kuehls to record what was happening.  Moore also called Barry Partelow, a Florida Fish and Wildlife Officer at the time of the incident, to notify him of their activities and their alleged finding—illegal fishing in federal waters.  Moore told Partelow he found sharks attached to hooks and cut them off the line.

Later, Partelow encountered Moore and saw that the floor of his boat was covered with fishing line, hooks, and fresh bait, but did not see any buoys.  After receiving a call from an unknown individual, who reported that they had seen the commercial boat suspected of engaging in the illegal fishing, Partelow investigated the boat.  It turned out to be the *Day Boat III*, and Partelow determined that it had all the proper permits.  He then reached out to Moore so that he could inspect the fishing line, and Moore told him it had been thrown into a dumpster at a nearby marina.  Special Agent Benjamin Boots of the National Oceanic and Atmospheric Administration's Office of Law Enforcement confirmed that the *Day Boat III* had the appropriate permit for the type of fishing it had been engaged in.  The instant case ensued.

Moore and Mansell were indicted by grand jury for one count of theft of property within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 661. The indictment alleged that they were operating a charter vessel engaged in "conducting trips for snorkelers and scuba divers to view sharks in federal waters offshore of Jupiter, Florida" when they "with the intent to steal and purloin, did take and carry away the personal property of another . . . having a value exceeding $1,000." Moore and Mansell jointly proceeded to trial.

Moore and Mansell submitted proposed jury instructions to the district court. Among the instructions, they requested the following for the description of the elements of § 661: "It's a federal crime for anyone to take and carry away, with the intent to steal or purloin, any property worth more than $1,000 and belonging to another, when the offense is committed within the special maritime and territorial jurisdiction of the United States." They also requested that the court define "to 'steal' or 'unlawfully take'" as "to wrongfully take good[s] or property belonging to someone else with intent to deprive the owner of the use or benefit permanently or temporarily and to convert it to one's own use or the use of another." Further, they requested the following theory-of-the-defense instruction:

> It is the defense's theory of the case that when a defendant removes and brings to the attention of law enforcement, property that he erroneously believes was being unlawfully used, posing an unreasonable danger to maritime life, he has not acted with the

intent to steal or purloin and you must find him not
guilty.

It is also the defense's theory of the case that when a
defendant removes items from open water, and does
not take those items for his own use or benefit or the
benefit or use of others, then he lacks the intent to
steal or purloin and you must find him not guilty.

The Government objected to the inclusion of "conversion
language" in the proposed definition of "to steal or unlawfully
take," asserting, "[w]e are not really riding on conversion here."
The Government argued that § 661 does not charge conversion.
Instead, it countered, the statute only covers taking and carrying,
stealing, and purloining.  "[The Defendants] think conversion
means with the intent to, obviously, employ yourself, keep for
yourself, and that is not the definition of steal or take away," the
Government contended.  In response, Moore and Mansell re-
quested that the language be included, stating, "I don't think it's
just a conversion," and that "the conversion of [the property], as
well, is what creates the theft."  Moore and Mansell specifically
noted that they took the language regarding conversion of prop-
erty "to one's own use or the use of another" from the pattern jury
instruction for theft of an interstate shipment, which they con-
tended was comparable to § 661.

The district court sustained the government's objection
based on *Morissette v. United States*, 342 U.S. 246 (1952), reasoning
that "conversion is when you get something lawfully and then you

keep it." The court noted that, regarding interstate goods theft, conversion is when someone is given property with authorization to take it but then decides to keep it: "Conversion differs from theft in that regard. And so based on *Morissette*, I don't think conversion is an issue." Moore and Mansell then argued that both § 661 and theft of interstate goods required the taking of property "for one's own possession or the possession of another" because the property covered by those statutes was "not in someone's personal home" but "in open water, or the open road," and so required "more than the simple removal of it." The court replied that was not a relevant distinction. The Government added that the geographic spot was the jurisdictional issue, noting that the words "conversion" or "to convert" had been left out of § 661, but were used in other theft and embezzlement statutes. The district court also decided to define "purloin" as "to appropriate wrongfully."

The district court instructed the jury as follows: "To steal or lawfully [sic] take means to wrongfully take property belonging to someone else with the intent to either permanently or temporarily deprive the owner of his right to the property or the use of the benefit from it." It also instructed on the definition of purloin as "to appropriate wrongfully" and stated the Defendants' theory of the case was "that the Defendants removed property without the bad purpose to disobey or disregard the law and therefore did not act with the intent to steal or purloin."

The jury deliberated for two days—longer than the actual presentation of the evidence—and sent multiple notes to the court.

It expressed it was unable to reach a unanimous decision, and the court gave an *Allen*[1] charge.  After the court read the *Allen* charge, the jury submitted another note asking if there were any other defense theories.  Ultimately, the jury found both Defendants guilty of the single count.  The court sentenced both Defendants to a term of one year of probation.[2]  As such, Moore and Mansell now have the status of convicted felons.  They timely appealed.

## II.    Analysis

We note at the outset that the decision to seek the return of the indictment from the grand jury essentially rests within the discretion of the United States Attorney—those decisions may be based on pre-indictment considerations not a part of the record.  Nor are we asked to determine the sufficiency of the evidence to convict.  Instead, we are tasked with reviewing one issue only: whether the district court abused its discretion in issuing the jury instructions.  For the reasons stated below, we find that the district court did not abuse its discretion.  That ends our review, and we therefore affirm.

We review a district court's rejection of a proposed jury instruction for abuse of discretion.  *United States v. Dean*, 487 F.3d 840, 847 (11th Cir. 2007) (per curiam).  We find "reversible error where the requested instruction (1) was correct, (2) was not substantially covered by the charge actually given, and (3) dealt with some point

---

[1] *Allen v. United States*, 164 U.S. 492 (1896).

[2] The district court also imposed a $1,000 fine against Moore only.

in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Eckhardt*, 466 F.3d 938, 947–48 (11th Cir. 2006). "We review the legal correctness of a requested jury instruction de novo." *United States v. Takhalov*, 827 F.3d 1307, 1312 (11th Cir. 2016) (quotation marks omitted and alteration adopted). Importantly, pattern jury instructions do not hold binding authority, unlike precedential case law. *United States v. Carter*, 776 F.3d 1309, 1324 (11th Cir. 2015).[3]

Statutory interpretation begins with the text of the statute. *United States v. Garcon*, 54 F.4th 1274, 1277 (11th Cir. 2022) (en banc), *abrogated on other grounds*, *Pulsifer v. United States*, 144 S. Ct. 718 (2024). Here, the relevant statutory text provides that "[w]hoever, within the special maritime and territorial jurisdiction of the United States, takes and carries away, with intent to steal or purloin, any personal property of another shall be punished." 18 U.S.C. § 661. The Supreme Court has stated that, when interpreting federal criminal statutes "where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning." *United States v. Turley*, 352 U.S. 407, 411 (1957). However, "stealing" and "stolen" have no accepted common-law meaning and should not be likened to common-law larceny. *Id.* at 411–12.

---

[3] Both parties discuss the Circuit's pattern jury instructions in arguing their case. We do not address these arguments as they have no bearing on our decision—pattern jury instructions are not binding law.

"Freed from a common-law meaning, we should give 'stolen' the meaning consistent with the context in which it appears." *Id.* at 412–13.  In the context of a statute criminalizing transportation of stolen vehicles, the Supreme Court concluded, "'[s]tolen' includes all felonious takings . . . with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." *Id.* at 417 (internal citation omitted).[4]

  In *Morissette v. United States*, the Supreme Court considered an appeal of a conviction under 18 U.S.C. § 641, which stated, "'whoever embezzles, steals, purloins, or *knowingly converts'* government property is punishable by fine and imprisonment." 342 U.S. at 248 (emphasis added).  It concluded that the omission of an explicit intent element in § 641 did not imply that the element did not need to be proven.  *Id.* at 263.  In its discussion of the history and purpose of § 641 to determine Congress's intent regarding mental state, the Court distinguished, in dicta, between stealing and conversion.  *Id.* at 263–73.  "Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing. 'To steal means to take away from one in lawful possession without right with the intention to keep wrongfully.'" *Id.* at 271 (quoting *Irving Tr. Co. v. Leff*, 171 N.E. 569, 571 (N.Y. 1930)).

---

[4] The Supreme Court clarified that it was using the term felonious "in the sense of having criminal intent rather than with reference to any distinction between felonies and misdemeanors." *Turley*, 352 U.S. at 410 n.4.

While our circuit has not interpreted the meaning of "steal" in the context of § 661, our predecessor Fifth Circuit considered the term's meaning in a nearly identical statute. In *United States v. Bell*, the Fifth Circuit evaluated a violation under 18 U.S.C. § 2113(b), which states, "'[w]hoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding [$1,000] belonging to . . . any bank . . . shall be . . . imprisoned.'"[5] 678 F.2d 547, 548 (5th Cir. Unit B 1982) (en banc) (quoting 18 U.S.C. § 2113(b)).[6] In interpreting whether the relevant conduct fell within § 2113(b)'s ambit, our predecessor court reaffirmed its holding in *Thaggard v. United States*, 354 F.2d 735 (5th Cir. 1965), in which it embraced the Supreme Court's definition of "steal" from *Turley* in the context of § 2113(b). *Id.* at 736–37. Several of our sister circuits have interpreted § 661 and held it is broader than the common-law definition of larceny under *Turley*.[7]

---

[5] The original monetary value included in the statute as quoted in *Bell* was $100. The bracketed text states the monetary value reflected in 18 U.S.C. § 2113(b) today.

[6] Because Eleventh Circuit judges were the same judges who decided former Fifth Circuit cases by Unit B panel and en banc, the Unit B panel decisions are binding on the Eleventh Circuit. *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (stating Unit B panels of the old Fifth Circuit are binding on the Eleventh Circuit).

[7] *United States v. Henry*, 447 F.2d 283, 285–86 (3rd Cir. 1971) (holding that "18 U.S.C. § 661 and its predecessor statutes were not codifications of the common law crime of larceny but were intended to broaden that offense," and affirming a jury instruction that defined "to steal or purloin" as "any taking whereby a person, by some wrongful act, willfully obtains or retains possession of property belonging to another without the permission or beyond any permission

In this case, the district court did not abuse its discretion in rejecting the Defendants' proposed jury instruction because the proposed instruction was not a correct interpretation of § 661. *See Dean*, 487 F.3d at 847; *Eckhardt*, 466 F.3d at 947–48. Moore and Mansell state they rely on *Morisette* and *Turley* to support the conclusion that the *lucri causa* element should apply in the context of § 661. Yet *Morisette* does not support this analysis, and applying *Turley* yields the opposite result.

First, the text of § 661 does not explicitly include any language requiring a *lucri causa* element. *See* 18 U.S.C. § 661. But Moore and Mansell's argument centers on the term "steal," which is not necessarily clear on its face, so the plain text does not require a specific outcome. *See id.*

The Supreme Court held in *Turley* that "stealing" in federal statutes is not defined by common law. 352 U.S. at 411–12. "[S]tolen" as interpreted in *Turley* includes "all felonious takings . . . with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." *See id.* at 417. The old Fifth Circuit found this definition applied to § 2113(b), a statute with intent language identical to § 661's. *Bell*, 678 F.2d at 548. Similarly, our sister circuits have also

---

given with the intent to deprive the owner of the benefit of ownership"); *United States v. Maloney*, 607 F.2d 222, 226, 231 (9th Cir. 1979) (explaining § 661 was not limited to the common-law definition of larceny and the Supreme Court's definition of "stolen" in *Turley* was applicable in the context of § 661); *see also United States v. Gristeau*, 611 F.2d 181, 184 (7th Cir. 1979) (adopting the Ninth Circuit's reasoning in *Maloney*).

interpreted *Turley*'s definition to apply to § 661. *United States v. Henry*, 447 F.2d 283, 285–86 (3rd Cir. 1971); *United States v. Maloney*, 607 F.2d 222, 231 (9th Cir. 1979); *United States v. Gristeau*, 611 F.2d 181, 184 (7th Cir. 1979). These cases do not indicate that the federal statutory definition of "steal" includes the idea of *lucri causa*. Moore and Mansell rely on the term "felonious" in *Turley*'s definition, but the *Turley* Court explained that it was using felonious "in the sense of having criminal intent," not to incorporate common-law terms where it previously stated they do not apply. 352 U.S. at 410 n.4, 411–12. Moore and Mansell contend that they are not arguing that "steal" in § 661 has a common-law definition, but this is belied by the attempt to interpret § 661 by reference to common law. The term *lucri causa* derives from the common-law definition of larceny in Blackstone, and therefore does not belong in the definition of "steal" in § 661, which is broader than the common-law definition of larceny under *Turley* and *Bell*'s reasoning. *See id.* at 411–12; *Bell*, 678 F.2d at 548; 4 William Blackstone, *Commentaries* *229–232.

*Morissette*, on the other hand, is not explicitly relevant to this case. *Morisette*'s analysis centered on 18 U.S.C. § 641. This statute included the term "convert," which, importantly, is not present in § 661. As such, any attempts to overlay *Morisette*'s reasoning to § 661 would be inapposite.

Moore and Mansell make much of the offhand dicta in *Morisette*: "Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing." 342 U.S. at 271. This,

however, their case does not make. *Morissette* examined whether § 641 had a criminal-intent element despite having no *mens rea* language in its text. *Id.* at 249–50. It did not concern the interpretation of "steal" in the federal statutory context. The Supreme Court's conversation regarding the difference between stealing and conversion was to provide background context for its analysis regarding the absence of *mens rea* language in § 641—not to provide conclusive definitions of stealing and conversion. *See id.* at 263–73. This is evidenced by: (1) the Supreme Court's phraseology, *"Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing,"* and that (2) the Court cited a New York Court of Appeals decision for its definition of stealing. *Id.* at 271 (emphasis added) (citing *Leff*, 171 N.E. at 571). Both indicate that it was not crafting a generally applicable definition for "steal" within statutory interpretation, unlike in *Turley*. *See* 352 U.S. at 411–12, 417. *Turley* overtly addressed the definition of "steal" within a federal statute and considered its applicability to the common law in a general context.

Overall, *Turley* is more applicable to § 661's interpretation in this case than *Morissette*'s conditioned definition offered in an unrelated context. *See Morissette*, 342 U.S. at 271; *Turley*, 352 U.S. at 411–12, 417. Applying *Turley*, we find no basis for Moore and Mansell's contention that takings must be *lucri causa* under § 661.

### III.    Conclusion

In short, Moore and Mansell's proposed jury instruction—that the jury must find that they took the fishing gear with

the intent to keep the gear for themselves or to convert it to their own use to convict them under § 661—was incorrect. Therefore, the district court did not abuse its discretion by rejecting it. We affirm the district court's rejection of Moore and Mansell's proposed jury instruction.

**AFFIRMED.**

LAGOA, Circuit Judge, joined by GRANT, Circuit Judge, concurring:

I concur in full with the majority. Because I am bound to consider only the single, narrow issue raised on appeal, I join my colleagues in affirming. But I do so with reluctance, as I explain below.

John Moore, Jr., and Tanner Mansell are felons because they tried to save sharks from what they believed to be an illegal poaching operation. They are the only felons I have ever encountered, in eighteen years on the bench and three years as a federal prosecutor, who called law enforcement to report what they were seeing and what actions they were taking in real time. They are felons who derived no benefit, and in fact never *sought* to derive any benefit, from the conduct that now stands between them and exercising the fundamental rights from which they are disenfranchised. What's more, they are felons for having violated a statute that no reasonable person would understand to prohibit the conduct they engaged in.

## I.

As the majority explains, this case arose from events that occurred on a shark-tour charter boat, on which Moore was the operator and Mansell was a deckhand. I recount here only the facts most essential to my concurrence.

Camryn Kuehl is a tourist who was out for a shark tour with Moore and Mansell on August 10, 2020. She testified that, at some point during their tour, Moore and Mansell pointed out a long fishing line in the water and told Kuehl and her family that it was an

"illegal longline fishing line" with sharks caught on it.  Moore, Mansell, Kuehl, and Kuehl's family all sprung to action, pulling the line into their boat.  In the process, Moore and Mansell cut certain portions of the line to release the ensnared sharks.  Shortly after they encountered the line and started working to free the sharks, someone on the boat (Kuehl did not recall who) called law enforcement to report what they were doing.  Kuehl "thought [they] were doing a great thing" and shared pictures on social media reporting as much to her friends.

A Fish and Wildlife Conservation officer, Barry Partelow, testified that it was Moore who had called to report the shark-fishing line—and that he (Moore) was cutting the sharks free.  Partelow told Moore to retain the gear for his investigation.

Christopher Perez, dockmaster at the nearby marina, testified that at some point on August 10, 2020, he learned that there was a pile of fishing line and gear on his dock.  He instructed his employees to remove it and throw it in a dumpster, and they did.

The fishing gear turned out to be part of a shark research program, authorized by the National Oceanic and Atmospheric Administration.  The owner of the boat that placed the line, Scott Taylor, and her captain, Richard Osburn, were duly permitted and approved to deploy this type of gear as part of the research initiative.

## II.

For reasons that defy understanding, Assistant United States Attorney Tom Watts Fitzgerald learned of these facts and—taking

a page out of Inspector Javert's playbook—brought the matter to a grand jury to secure an indictment for a charge that carried up to five years in prison. Watts Fitzgerald decided to pursue this indictment despite the following undisputed facts: Moore and Mansell (1) called law enforcement to report what they were doing, (2) were comfortable involving their tourism customers in their actions, (3) encouraged Kuehl to record what was happening, and (4) returned the gear to the marina dock as instructed. Against the weight of all this—which, in my view, plainly suggests a good-faith mistake on Moore and Mansell's part—Watts Fitzgerald determined that this case was worth the public expense of a criminal prosecution, and the lifelong yokes of felony convictions, rather than imposition of a civil fine.[1]

To be sure, the executive branch is entrusted with "the decision whether or not to charge an individual with a criminal offense in the first place." *In re Wild*, 994 F.3d 1244, 1260 (11th Cir. 2021). As the Supreme Court has recognized, "the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse." *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978). While "[t]his broad discretion rests largely on the recognition that the

---

[1] At oral argument, the government doubled down on its decision to prosecute. In response to the Appellants' suggestion that a civil fine would have been a more appropriate resolution in this case, the government asserted that "if someone steals a car on a military base, you don't—the proper response isn't, well, pay restitution for that. That's a crime." And, as Judge Grant aptly explained in the moment, "[t]hat is a silly example. There is no comparison."

4                         LAGOA, J., Concurring                    23-10579

decision to prosecute is particularly ill-suited to judicial review,"
*Wayte v. United States*, 470 U.S. 598, 607 (1985), prosecutors are not
immune from judicial criticism for their imprudent—albeit law-
ful—exercises of authority.  And that imprudent exercise of discre-
tion is, in my view, what occurred in this case.

### III.

Moore and Mansell were convicted of violating 18 U.S.C. §
661, which reads in relevant part:

> Whoever, within the special maritime and ter-
> ritorial jurisdiction of the United States, takes and car-
> ries away, with intent to steal or purloin, any personal
> property of another shall be punished as follows:

> If the property taken is of a value exceeding
> $1,000, or is taken from the person of another, by a
> fine under this title, or imprisonment for not more
> than five years, or both; in all other cases, by a fine
> under this title or by imprisonment not more than
> one year, or both.

There is no dispute that Moore and Mansell "took and carried
away" the "personal property of another."  That much, we can set
aside.  Our focus, then, narrows on "with *intent* to steal or purloin,"
which the government stretched to its farthest possible application
in this case.  Consider a few hypotheticals that shed some light on
the problem of the government applying this statute in this way:

Adam, walking along a path in a federal park, sees an elderly
woman carrying a purse overflowing with cash.  Adam—seeing the
purse and cash—rushes up behind her, grabs the purse, and flees.

23-10579              LAGOA, J., Concurring              5

We would all agree that Adam has stolen from the woman within the meaning of § 661: in a federal jurisdiction, he took the property of another with bad purpose, intending to deprive her of the rights to her property.  That one is simple enough.

Now imagine that Bob, walking along a path in a federal park, sees a man rush up to an elderly woman from behind, pull a gun from his pocket, and yell "Give me your purse or I'll shoot." Bob rushes the robber, yanks the gun from his hand, and ushers the old woman out of harm's way while the robber flees.  Bob holds onto the gun until the police arrive, and then he turns the gun over to law enforcement.

Has Bob stolen from the robber?  Under the government's theory in this case and applying § 661 as broadly as the government did here, yes, Bob has committed a felony.  Bob took and carried the property of another (the gun) with the intent to deprive its owner (the robber), either permanently or temporarily, of his right to use or benefit from the property.  And, again based on the government's theories and the instructions given in our case, Bob's conduct would be criminally "willful" because he intended to do the thing the law forbids: he intended to take the gun from its owner to prevent the owner from using it, and that is forbidden under § 661.  Perhaps Bob would be able to take advantage of certain affirmative defenses, including self-defense or defense of another, but Bob should not have to get to that point—because Bob should not be prosecuted.

Imagine, now, that Bob called the police during his encounter with the robber and told the police "I just walked into an armed robbery, and I disarmed the robber, and I am holding his gun now so he cannot shoot the victim." This clear gesture of good faith would not, according to the government here, mitigate Bob's culpability or factor into its charging decision.

Finally, consider a third variation that comes the closest to our facts. Imagine that what Bob witnessed was not a genuine robbery, but a scene being acted out by some students from the local community college. The robber was not a robber at all, but the elderly woman's scene partner for drama class. Bob, of course, had no way of knowing that when he interrupted what he believed to be a violent crime. Again, under the government's theory, this genuine mistake would be of no moment, because all that matters is that Bob took the "robber's" property with the intent to deprive him of it. Perhaps it would move the needle if Bob's lawyers requested an instruction on mistake of fact, aiming to undermine the mens rea needed to convict.[2] But, again, Bob should not be prosecuted in the first instance.

---

[2] In certain circumstances, a mistake of fact is sufficient to negate the mens rea element of a charged offense. *See, e.g.*, *Staples v. United States*, 511 U.S. 600, 607 n.3 (1994) ("Generally speaking, such knowledge is necessary to establish mens rea, as is reflected in the maxim *ignorantia facti excusat*."); *United States v. Feola*, 420 U.S. 671, 686 (1975) (observing that, with respect to a statute prohibiting assault on a federal officer, "where an officer fails to identify himself or his purpose . . . . one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent."); § 13:2. Mistake of Fact, 1 Wharton's Criminal Law § 13:2 (16th ed.) ("Generally

## IV.

I am bound to affirm Moore and Mansell's convictions because the only issue their lawyers identified on appeal—the "conversion" jury instruction—fails to persuade, for all the reasons explained in the Majority Opinion. But I would be remiss if I joined in affirming without commenting on the troublesome aspects of the case before us.

---

speaking, a person who engages in penalty prohibited conduct is relieved of criminal liability if, because of ignorance or mistake of fact, they did not entertain the culpable mental state required for commission of the offense.").